18 So.2d 641

**WHITE v. BROUSSARD.**
No. 37064.

May 22, 1944.

Rehearing Denied June 26, 1944.

Arthur Miller, of New Orleans, for defendant and appellant.

Joseph M. Bowab, of New Orleans, for plaintiff and appellee.

FOURNET, Justice.

John Thomas White, Jr., alleging that his wife, Nellie Broussard White, abandoned him and their fifteen month old son without cause on November 4, 1934, seeks a divorce from her in this suit and the custody of the child.

In her answer the defendant generally denied all of the allegations of the petition but specifically averred that her departure from the matrimonial domicile had been precipitated by a severe beating given her by her husband, the culmination of continued harsh and cruel treatment on his part; that she had not abandoned her child on this occasion but had, instead, endeavored, despite her lack of means to support him, to take him with her, only to have the child forcibly taken from her by the plaintiff. She prayed for the custody of the child and alimony consistent with her husband's income.

There was judgment in the lower court in favor of the plaintiff, granting him both a divorce and the care and custody of the minor child, and the defendant has appealed.

The record shows that the plaintiff and defendant were married on July 28, 1931, at which time the defendant was only 16 years old. Following their marriage they moved into the home of Zachary A. Smith, a friend of the family. It appears that the plaintiff's mother had strenuously opposed his marriage to the defendant and had refused to have them live with her, but that, due to the plaintiff's inability to make a living for himself and his wife, his mother was forced to take the couple to live with her, and, in July of 1933, that a child, John Thomas White, III, was born of the union. Because of an altercation, the plaintiff and defendant separated on November 4, 1934, and the child remained with the plaintiff, the defendant going to Baton Rouge to live with an aunt; later,

in 1940, she moved to California where she lived with another aunt. The defendant visited her child at the home of her mother-in-law at fairly regular intervals during the time she lived in Baton Rouge, she and her husband carrying on a regular correspondence during the years of the separation. Some of this correspondence is in the record and it discloses that not only the plaintiff, but also his mother and sisters, visited the defendant while she was living in California, and that their apparently friendly relationship continued until the defendant, on a visit to New Orleans, secured permission to take the child to a show and took him, instead, to California, where she filed a suit for divorce from her husband. After this, the plaintiff went to California, abducted the child, and returned with him to Louisiana, where he filed this suit.

The parties have been living separate and apart for more than two years; consequently, under the express provisions of Act No. 269 of 1916, as amended by Act No. 430 of 1938, the plaintiff is entitled to a divorce, leaving for our consideration the question of which of them is entitled to the custody of the minor child and of alimony.

Our lawmakers long ago very sagaciously turned from the antiquated theory of punishing the party cast in a divorce proceeding to the far more important consideration of the welfare of those children that are unfortunately and unhappily swept along in the turbulent wake of dissolved marriages when, in adopting Act No. 38 of 1921, Ex.Sess., they added to Article 157

of the Revised Civil Code, containing the provision that "In all cases of separation and of divorce the children shall be placed under the care of the party who shall have obtained the separation or divorce," the further discretionary stipulation "unless the judge shall, for the greater advantage of the children, order that some or all of them shall be entrusted to the care of the other party."

■ In applying this provision, the courts have consistently held that the right of the mother to the custody of the minor child is paramount to that of the father, unless, in his discretion, the trial judge concludes it is for the greater advantage of the child that it be entrusted to the care of the father, which conclusion is, of course, subject to review by us. Brewton v. Brewton, 159 La. 251, 105 So. 307; O'Dwyer v. Natal, 173 La. 1075, 139 So. 486; Higginbotham v. Lofton, 183 La. 489, 164 So. 255; and the very recent case of Black v. Black, 205 La. 861, 18 So.2d 321; and Matheny v. Matheny, 205 La. 869, 18 So.2d 324, and the cases therein cited.

We do not know what prompted the trial judge to award the custody of this child to the plaintiff, for we do not have his appreciation of the evidence in written reasons for judgment. A careful study and analysis of all of the cases on this subject, however, reveals that this court has consistently awarded the custody of a minor child to the mother unless she is found to be morally unfit or unless, as has been the occasion in very exceptional cases, the mother is incapable of taking care of the child.

Apparently the plaintiff was cognizant of the fact that he had to prove his wife's immorality or incapacity to care for the child, for at the outset of the trial his counsel called her to the witness stand under Act No. 126 of 1908 and sought, under a caustic cross-examination, to elicit from her admissions that she had frequented places (of immorality) mentioned to her by name. Having failed in this respect, the plaintiff himself took the witness stand in his own behalf and stated he knew his wife had frequented houses of assignation with men in the city of Baton Rouge, although he admitted he had never seen her go into such places and that he was unable to establish the fact by any other witnesses, although he had made an effort to secure them. We think the trial judge very aptly remarked, when defendant's counsel asked that the plaintiff's testimony in this respect be stricken from the record, that he had "deleted it himself by his own testimony." After these failures to establish his wife's immoral character, the plaintiff did make another feeble effort along this same line when he placed his nine year old son on the witness stand and elicited from him the fact that he did not want to live with his mother because "She is not a fit lady." However, an analysis of the boy's testimony not only completely refutes this statement, but, in fact, establishes the contrary to be true.

The plaintiff not only failed to impugn his wife's character, but we think her moral character is conclusively established by her witnesses. Mrs. Willard R. Wirth (wife of Dr. Wirth, a prominent New Or-

leans physician) and her mother, Mrs. Miles Keohoe, both women of high standing in this city, stated the defendant's mother had worked for them over a period of twenty years and that they had known the defendant to be a fine girl from her childhood. The aunt with whom the defendant lived in Baton Rouge, Theresa Van Divers, stated most emphatically she would not have allowed the defendant to stay in her home had she not conducted herself with every decorum because of the presence in the home of her own teen-age daughter, whose room and bed the defendant shared while she was there. While in Baton Rouge the defendant supported herself, first by working in the kitchen of the Paradise Inn and later by working in various cleaning establishments and laundries. She attended the Progressive Baptist Church, according to the testimony of Savery White, his wife Eugenia, and the Rev. M. W. Rivers, pastor of the church for ten years—all disinterested parties. The Rev. Rivers stated he had known the defendant and her family for a good many years, having come from the same small country community, and he characterized her family as good people, "the best kind of people in my mind." Louise Gorham, who lived in Baton Rouge but went to California when the defendant did and stayed there with her in the home of the defendant's aunt, attested to her exemplary conduct in every respect while in California. Finally, we think the plaintiff's own letters to his wife during the period of their separation reflects, at an unsuspicious time, his own appreciation of his wife's good character.

As a further reason why the defendant should not be awarded the custody of the child, the plaintiff maintained she had not only abandoned him and the child on November 4, 1934, without cause and provocation, but that she had since shown little or no inclination or desire to have the child's custody. He testified his wife deliberately abandoned him and their child in a rage that ended with her throwing a light bulb at him when he refused to permit her to go to Baton Rouge, from which city she had just returned after a two-weeks visit to her mother, and that she made no effort whatever to even see the child until some eight months thereafter.

The defendant's version of this matter is that her husband had not only subjected her to his harsh and cruel treatment during the greater part of their married life, but also the nagging and abusive treatment of his mother and sisters, with whom he compelled her to live, and that on the morning of November 4, 1934, when she requested permission to take her grandmother, who was going to Baton Rouge, to the station to catch her train, he beat her so unmercifully in refusal that she fled from the house and endeavored to take the baby with her, only to have the child forcibly taken from her, and that when she returned later the same day with her mother, her mother-in-law, sister-in-law, and husband met her on the gallery and threw her clothes at her stating she was not wanted, could not come back, and that the child would remain with them. She stated she had not endeavored to see the child as frequently thereafter as she would ordinarily

have done because of the treatment she received at the hands of her husband's family and her husband, when he was in the neighborhood.

The plaintiff, realizing the weakness of his cause, sought to bolster up his rather feeble version of the events leading up to the separation by the testimony of his mother and sisters, who, in addition to corroborating his version of the matter, added that the cause of the trouble was the defendant's solicitation for her mother's children and the resultant neglect of her own baby. To corroborate their testimony in this respect, the plaintiff introduced in evidence two letters addressed to the defendant by her mother, which letters, he contends, form the basis for the visits of his wife to Baton Rouge that culminated in their separation. While in one of these letters the defendant's mother does advise that she and the baby are not well, the letter was obviously written for the purpose of having the defendant get her mother's things and take them to a Mrs. Johness. In the other, the mother also advises of her illness and that of her baby, but she only asked the defendant to go to Baton Rouge in order that she might accompany her back to New Orleans on the train. The plaintiff evidently overlooked the fact that the first of these letters was dated August 3, 1932, and the other August 24 of the same year, and had been written a year prior to the birth of his own son. He also overlooked the fact that they could have had nothing to do with the separation, for that did not occur until November of 1934, more than two years later. Still another

fact overlooked by the plaintiff was that the defendant's mother was living in New Orleans at the time of the separation and not in Baton Rouge, where she was when the letters were written.

Plaintiff's witness, Ruth Thompson, a school teacher who apparently spent all of her week-ends and vacations with the plaintiff's sister, stated she had no knowledge of the cause of the trouble and that the only part of the difficulty she saw was the defendant leaving the house. It is significant that she denied having any knowledge of the altercation between the plaintiff and defendant on direct examination but that, when pressed on cross-examination, she admitted "evidently there was some difficulty between the husband and wife, or there seemed to be some difficulty between the husband and wife and the wife was absent after that." And again, when asked "And you thought there was trouble," she replied: "Yes, from their actions I thought there was."

We think the evidence clearly shows the defendant's departure from the matrimonial domicile was caused solely by the treatment accorded her by her husband, culminating in the severe beating administered to her on the morning of November 4, 1934. Her version of the events leading up to the separation are not only more reasonable and consistent throughout, but it is corroborated by her own witnesses, and, in many important respects, by the witnesses of the plaintiff. The fact that she was beaten by her husband on the morning she was forced to flee is corroborated by her mother, to whose home she

fled following the altercation; her aunt in Baton Rouge, where she went to live immediately thereafter; and by Savery White, a friend of both the plaintiff and defendant who lived near the aunt and saw the defendant when she arrived in Baton Rouge. All of these witnesses stated the defendant's face showed evidences of a recent severe beating. It is interesting to note that although the plaintiff's mother was asked on numerous occasions during her cross-examination whether she had seen her son strike the defendant, she never denied this fact but, instead, cleverly evaded a direct answer, her following reply being typical: "She knows I would not allow him to hit her."

The defendant testified the plaintiff's mother had opposed her marriage and that his sisters did not speak to her although she lived in the same house with them. The mother and sisters subsequently corroborated this part of her testimony.

In any event we can see no good reason for awarding the custody of this child to the plaintiff. When he is in New Orleans he lives with his aged parents, who are admittedly in ill health. (The record shows that because of his mother's illness, the boy was sent to stay for several months with one of plaintiff's sisters, in Lake Charles.) But the plaintiff is seldom in New Orleans, because his duties of pullman porter take him all over the country. According to his correspondence with the defendant, in the record, he was in King City, California, on July 3, 1941; in Tacoma, Washington, on August 9, 1941, and he stated he had just been in Washington, D. C.; and in Seattle, Washington, on August 23, 1941. In a letter dated September 25, 1941, he stated: "I wrote you when I was in *New York* * * * I got home on the thirty-first of August and having been running in and out of there since. I left for *Fort Worth, Tex.* the same nite Bill left home * * * I am in *Oklahoma City* now and thought I would come out there [Los Angeles, where the defendant was then living] from here but I think the [we] are going to * * * *Fort Benning, Ga.* * * *." (Brackets and Italics are ours.)

The defendant, on the other hand, lives in Los Angeles, California, with her aunt and uncle, who admittedly have a good home which the plaintiff, his mother and sisters have visited. The aunt in particular was highly praised by the plaintiff in his correspondence with the defendant. They are people of good reputation and standing in the community, the uncle drawing a pension from the government as a veteran of the last war and being presently employed in a concentration camp. The defendant is employed as a seamstress in a cleaning establishment and makes on an average of $23 a week, after all governmental deductions are made. Her love for the boy has been attested by all of the witnesses, even those of the plaintiff, who stated she made trips to New Orleans to see him every two or three weeks when she was living in Baton Rouge, and that she gave him presents on all occasions (Easter, Thanksgiving, Christmas, etc.). Her love for him is further attested by the fact that, once financially able to do so, she left her job in California and returned here to fight for his

custody, and by the fact that she freely offered to forego her prayer for alimony, explaining she was concerned only with securing the custody of her child. The evidence shows the plaintiff's work takes him as frequently to Los Angeles as it does to New Orleans and that he will be able to visit his son there.

It is our opinion, therefore, that the custody of the minor child should be awarded to the defendant.

We think the evidence conclusively shows, as just demonstrated, that the defendant had just cause and provocation for leaving her husband; consequently, under the express provisions of Article 160 of the Revised Civil Code, as amended, this court may allow her alimony out of the property and earnings of the plaintiff.

When questioned relative to his earnings, the plaintiff stated he worked by the hour and "made" 250 hours a month, averaging $113.25. He omitted to include any of the tips that are customarily received by men in his profession. Taking into consideration, therefore, his admitted earnings and the fact that the defendant is employed, we think alimony in the sum of $25 a month is reasonable.

For the reasons assigned, the judgment of the lower court awarding the custody of the minor child, John Thomas White, III, to his father, is annulled and set aside, and it is hereby ordered, adjudged, and decreed that the judgment be amended to award the custody of the child to the defendant, Nellie Broussard White, and alimony at the rate of $25 a month, effective

from the day this judgment becomes final, and, as thus amended, that the judgment be affirmed; the plaintiff to pay all costs of this proceeding.

O'NIELL, C. J., and ODOM, J., dissent.