56 So.2d 570

**ANE v. ANE.**

**No. 40100.**

Supreme Court of Louisiana.

Dec. 10, 1951.

Rehearing Denied Jan. 14, 1952.

Robert L. Hickerson, New Orleans, for appellant.

Bentley G. Byrnes, New Orleans, for appellee.

HAMITER, Justice.

The defendant, Mrs. Louise Lambiotte Ane, who is the divorced wife of the plaintiff, Dr. J. N. Ane, is appealing from that part of a judgment which awarded to the latter the permanent custody of their minor daughter, Miriam Ane.

The record discloses that the litigants were married on July 16, 1929, and that thereafter they established their matrimonial domicile in the City of New Orleans, residing at 3231 State Street Drive. Of the union two children were born, namely Dorothy Ane (now approximately 20 years of age and whose custody is not involved herein) and Miriam Ane (now about 11 years old).

In December, 1945, Dr. Ane left the mentioned family home, obtaining for himself a separate residence, and continuously since that time he has lived apart from his wife. The wife remained there with the children until about October 1, 1949, caring for them by means of an allowance of $35 per week and of various charge accounts provided by the husband.

On January 6, 1949, Dr. Ane instituted suit for a divorce on the ground that he and his wife had been living separate and apart for more than two years. The petition, among other things, alleged:

"That petitioner's younger child, Miriam Marie, now 7 years [should have been 9 years] of age, has been living with her mother in the latter's home at 3231 State Street Drive in the City of New Orleans, and because of her tender age, and so long as her mother shall take proper personal care of her within the jurisdiction of this Court, petitioner is entirely willing to have the said Miriam Marie continue to reside in the custody, care and control of her mother, but will ask the Court to order such arrangements as in the discretion of the Court shall seem proper for his periodic visitation with said child, at times and places to be directed by the Court, in order that he may have such degree of fatherly companionship and opportunity to observe the welfare of his said child." (Brackets ours.)

On the filing of that petition the court ordered that custody pendente lite of Miriam Ane be granted to the mother, the child to be maintained at 3231 State Street Drive.

Some eight months later, specifically on September 9, 1949, the litigants filed in the divorce proceeding a joint motion which, together with the attached order, recited:

"On joint motion of the parties to this suit and on suggestion to the Court: (1) That Mrs. Louise Jeanette Lambiotte Ane, defendant, under prior order of this Honorable Court, now has the custody pendente lite of the minor child, Miriam Marie Ane, aged seven years; (2) That Mrs. Louise Jeanette Lambiotte Ane, defendant, is will-ing that Joseph N. Ane, your petitioner, be granted the custody of the minor child, Miriam Marie Ane; (3) That Joseph N. Ane, your petitioner, is willing to accept and desires that this Honorable Court grant to him the said custody of the said minor child;

"It is ordered by the Court that, pendente lite, petitioner, Joseph N. Ane, is granted the provisional care and custody of the minor child, Miriam Marie Ane, the said minor child to be maintained in the City of New Orleans, and to be visited by the defendant Mrs. Louise Jeanette Lambiotte Ane, defendant, or to visit with the said defendant at such times and places as may be agreed reasonably between the parties, or, in the event of disagreement, at such times and places as may be hereinafter fixed by order of Court."

About October 1, 1949, Mrs. Ane left the family home on State Street Drive, going to Shreveport to live. At the same time Dr. Ane returned, re-establishing his residence there and assuming the care of the children.

On October 11, 1949, through confirmation of a previously entered default, a judgment was rendered in favor of Dr. Ane granting a divorce and dissolving the community of acquets and gains theretofore existing between the parties. It made no provision, however, for the custody of the minor, Miriam Ane.

Then followed the taking of an inventory which disclosed the net value of the com-

munity property to be $91,707.48. And on November 21, 1949, in effecting a settlement of that community, Mrs. Ane received $45,-853.74 in cash.

On March 24, 1950, Dr. Ane caused the issuance of a rule ordering Mrs. Ane to show cause why he should not be granted the permanent care, custody and control of the minor child Miriam Ane. In applying for the rule mover pointed out that he had obtained custody pendente lite of the child under the joint motion of September 9, 1949. Further, he alleged:

" * * * that it would be to the best moral, mental and physical advantage of the said child to remain under the custody of her father, and that it would be of great benefit and advantage to the said child to remain under mover's custody for many other reasons;

" * * * that mover's former wife, Mrs. Louise Jeanette Lambiotte Ane, is an unstable, excitable and nervous person; that her previous conduct and treatment of the minor child, Miriam Ane, has been such that it would not be to the child's advantage and benefit to be under her mother's custody, and that it is, on the contrary, to the great benefit and advantage of the child to remain under her father's custody, as above outlined."

Subsequently, Dr. Ane supplemented the above allegations by assigning detailed reasons for the child's remaining in his custody.

Answering the rule defendant denied categorically the charges made by plaintiff of her unfitness. And, in reconvention, she demanded the permanent care and custody of the child, affirmatively averring that she is the proper person for it.

Trial of the rule commenced on June 1, 1950, and the cause was submitted to the court for adjudication on June 6, 1950. However, on the latter date and at the request of both plaintiff and defendant, the court ordered a reopening of the matter and the appointment of Dr. Carl P. Adatto, a qualified psychiatrist, "as an expert to examine the defendant in rule, Mrs. Louise Jeanette Lambiotte Ane, and inquire into the condition of her mental faculties and make his report in writing to the court upon completion of the said examination."

Dr. Adatto submitted a written report under date of June 13, 1950, to which reference will be made hereinafter; and the court on June 14, 1950, rendered and signed a judgment, the pertinent portions of which are as follows:

"It is ordered, adjudged and decreed that there be judgment herein in favor of plaintiff in rule, Dr. Joseph N. Ane, and against the defendant in rule, Mrs. Louise Jeanette Lambiotte Ane, awarding the permanent care, custody and control of the minor child, Miriam Marie Ane, to the said Dr. Joseph N. Ane.

"It is further ordered, adjudged and decreed that the defendant in rule, Mrs. Lou-

ise Jeanette Lambiotte Ane, be granted the temporary custody of the said minor child, Miriam Marie Ane, as of this date up and through August 1st, 1950, and has permission to take the said minor child to Shreveport, Louisiana, and to return said minor child to Dr. Joseph N. Ane at New Orleans, Louisiana, on or before August 1st, 1950.

"It is further ordered, adjudged and decreed that the defendant in rule, Mrs. Louise Jeanette Lambiotte Ane, be granted the right of visitation with the said minor child, Miriam Marie Ane, at any reasonable hour when said defendant in rule might be in the City of New Orleans."

The present appeal of Mrs. Ane, the defendant, is from this judgment in so far as it awards the permanent custody of the child to Dr. Ane.

No dispute exists between counsel as to the law governing this matter. Nor could there well be one in view of the firmly established jurisprudence of this court that with respect to the custody of children of tender age, in a contest between the legally separated or divorced parents, the mother is always preferred to the father unless she is shown to be morally unfit or otherwise unsuitable therefor. Black v. Black, 205 La. 861, 18 So.2d 321; White v. Broussard, 206 La. 25, 18 So.2d 641; Sanford v. Sanford, 208 La. 1073, 24 So.2d 145; Willis v. Willis, 209 La. 205, 24 So.2d 378; Veillon v. Landreneaux, 209 La. 1060, 26 So.2d 139; State ex rel. Morrison v. Morrison, 212 La. 463, 32 So.2d 847; Sam-

pognaro v. Sampognaro, 215 La. 631, 41 So. 2d 456.

Dr. Ane is not contending that Mrs. Ane is morally unfit. In fact, when specifically asked during the trial if he was making that contention, he stated: "I have made no allegations regarding her morals in any way at all." He charges only that she is highly emotional and mentally unstable and, therefore, unsuitable for taking care of the child.

In support of this charge plaintiff sought to prove acts and actions on the part of the defendant not befitting a mentally normal person. For instance, the older daughter, Dorothy, and also a colored maid, both appearing on behalf of plaintiff, testified that the defendant, when caring for the two children prior to October 1, 1949, grossly mistreated Miriam by providing her no regular routine, by making promises to her and then breaking them, and by frequently beating her unmercifully while experiencing tantrums, as a result of all of which the child was always nervous and excitable and her health impaired. To quote from the older daughter's testimony respecting the beatings: "She would get very angry, and she would grab Miriam and hit her with her fist, and put her fingernails into her arm, and I have seen her slap her on the face so her finger prints have still been there when I brought her to school in the morning."

Again, those witnesses testified to an incident occurring in November, 1949, when the defendant, on returning to the former

home to obtain some of her belongings, became hysterical, screamed, and excited the child unduly. ·

The defendant admitted that while caring for the children, after Dr. Ane had set up for himself a separate residence, she was very nervous at times and that when punishing Miriam for disobedience on some occasions she might have been too severe, particularly on one when a small pointer stick was used in striking her across "the hiney". This nervousness of defendant is explained by her in the following testimony:

"Q. Have you noticed any change in your health since you have been living away from the Ane home at 3231 State Street Drive? A. I certainly have been more calm and in a better frame of mind.

"Q. Will you state what was your condition as to calmness or being upset while living at 3231 State Street Drive during the three or four years prior to October, 1949? A. A great deal of the time I was in a very depressed and nervous state, because of the conditions under which I had to live.

"Q. What conditions are those? A. Because Dr. Ane wasn't living at the residence with me, and even though I begged him to come home, even though he held out promises of reconciliation to me, he never moved back in the house; even though he would state on such occasions he was ready to, he never actually came back to the house

with his clothes and start living with me as he should as my husband.

\*    \*    \*    \*    \*    \*

"Q. During the period of three or four years prior to your leaving the home on State Street Drive in October, 1949, how many times per day or per week would you estimate he visited the house? A. As a general rule, in the first two years when he was away from the home, he would usually visit me and my daughter on week ends or in the evenings, but in the latter part, say 1948 and 1949, he would visit the home more frequently, in fact he would come in the home during the latter part of 1949, and all through 1949 before the divorce, he would approximately come in the house about once a day.

"Q. Would you state whether or not there would be pleasant conversations during the visits there, or what types of conversations would take place? A. The conversations weren't pleasant because I would be in more or less of a resentful frame of mind, and because of the fact that the doctor wasn't there and because of the different matters that would come up in regard to his office business or our own personal matters, the way he treated me and all.

\*    \*    \*    \*    \*    \*

"Q. Did Dr. Ane come visit the children on every Sunday? A. Dr. Ane had regular visits all during the past four years with Miriam and with Dorothy, but especially so with Miriam because Dorothy was away at Maryville.

"Q. When he came to the house, he came there and picked up the children? A. He would come pick up the two daughters, and was always insistent when I would suggest going along on these trips, he would say he was separated, and then of course we would get to arguing about him coming back and argue about different matters, and it would make matters unpleasant.

"Q. Was that before the divorce suit was filed? A. This was all during the five years before the divorce suit was filed. Of course I would feel quite resentful that Dr. Ane wouldn't take me along."

The defendant also admitted that she became hysterical on returning to the home in November, 1949. Regarding this she recalled that two days previously she had been accused by Dr. Ane and the colored maid of kidnapping Miriam, and the police were alerted, when she visited with her child in a parked automobile alongside the former family home. And she explained that the thoughts of such accusation and of the previous actions of Dr. Ane and his mother toward her brought on the hysterical condition. To quote her testimony in this connection:

"A. I started thinking about how Mrs. Ane was always acting unjustly toward me. Mrs. Ane was always making trouble during my marriage, and was still making trouble after the divorce, and was always making me out as negligent or ignorant or something.

"Q. When you had these thoughts in your mind you went in the house, and what happened then? A. Nothing happened immediately, Mr. Byrnes. In a few minutes I did go back to the kitchen and fussed at the maid about her actions. I said she had treated me unjustly, and certainly hadn't acted right in the matter, and I had been quite humiliated, don't you think, by the fact you are suddenly wanted by the police. I think it would be enough to make anyone angry. And I was supposed to pick up a few articles of mine, and Dr. Ane had informed me I could pick up the few articles and take them back, and there were a few things I wanted to get out of the hall, and I still thought Dr. Ane meant what he said about a reconciliation, and after the divorce went through I still thought he meant it about a reconciliation, and I was crying and grief stricken, and when I got on the chair to take that mirror down from the wall I started crying and became hysterical when I thought about losing the home. I had been married to this man for twenty years, and it was all coming down before me. I am afraid I didn't act, perhaps, as a normal person should act, but anyone would have acted that way under the same circumstances. And when I found out that Dr. Ane had been going out with this technician I perceived that the whole matter was quite clear to me. * * *"

But notwithstanding her admitted nervousness, the defendant insists that Miriam, while in her care and control, always re-

ceived proper motherly attention, was never unduly mistreated, and was continuously healthy, normal and happy. In corroboration of this, and contradictory of the assertions of cruel abuse by Dorothy Ane and the colored maid, is the testimony of numerous disinterested witnesses who appeared in defendant's behalf. Among these were some ten persons living in the immediate neighborhood of the Ane home on State Street Drive. They were well acquainted with Mrs. Ane and often saw her and Miriam together; most of them had children who frequently visited the Ane home and played with Miriam, and they would not hesitate to entrust their children's care to Mrs. Ane. The latter, whom they knew to be a lovely lady of refinement and education, and a perfect mother, was always devoted and attentive to Miriam and kept her neat and well dressed. The child never seemed to be nervous, excitable, poorly fed, or mistreated; to the contrary she at all times appeared to be happy, healthy, well nourished and properly treated.

The observation of the owner of a neighborhood grocery store, whom Mrs. Ane had patronized often for five or six years while accompanied by Miriam, was to the same effect with reference to the appearance of the mother and child. And a physician specializing in child diseases testified that Miriam, whom he had treated since her infancy, never bore any evidence of mistreatment; that she seemed well nourished; that she was neither unusually nervous nor an abnormal child in any other respect; and that he thought the mother gave her the attention that would usually be given to a child.

In further proof of the mental instability of the defendant Dr. Ane introduced in evidence certain letters written by her subsequent to October, 1949, some of which were addressed to him and others to a medical student at Tulane University. From the standpoint of composition, unquestionably many of these letters appear to be the writings of an adolescent girl rather than of a grown woman; for some are in poetry form, and almost all contain numerous emphasis signs such as underscorings, interlineations, marginal notations, and exclamation points. Too, several contain childish remarks, the use of which befits the lovelorn high school girl. But there can be no doubt that the writer's good intention is clearly expressed in each. In her letters to Dr. Ane she was continually pleading for their reconciliation and a re-establishment of their home life, using all known means of persuasion and every argument at her command to gain that end. The letters to the Tulane medical student had a two-fold purpose and no other. He was a friend of Dr. Ane and also a former suitor of Dorothy, her older daughter; and she was appealing to him (1) to do everything within his power toward bringing about a reconciliation between her and Dr. Ane, and (2) to renew his friendship for Dorothy. Besides, for these respective purposes, Mrs. Ane sent to the student her wedding

ring and Dr. Ane's college fraternity pin which had been entrusted to her.

Three prominent psychiatrists of New Orleans, witnesses for plaintiff and acquaintances of his for many years, testified that they had seen three of the letters addressed by defendant to Dr. Ane and that they were of the opinion that the writer thereof was involved in a mental illness. All admitted, however, that they had not examined Mrs. Ane and that their opinions were based not only on the letters but also on information received through long conversations had with Dr. Ane. One of these experts further said that from a reading of the letters alone he could not reach the conclusion that Mrs. Ane was mentally unstable; that he would only be suspicious of the proper emotional balance of the individual.

Additionally, in support of his charge that Mrs. Ane is incompetent, the plaintiff relies on her act of signing the joint motion of September 9, 1949, by which she voluntarily relinquished custody of the child pendente lite to him. The record discloses that at such time, as well as subsequently when the default divorce judgment was rendered and the property settlement effected, Mrs. Ane was not represented by counsel. And the reason she gave for signing the joint motion is the following:

"I was in a very extremely nervous condition and confused state of mind because of Dr. Ane's actions towards me, and at the time I still believed he would have a rec-

onciliation with me. In fact I never thought he would go to court, go through with the divorce, and I thought by granting him the temporary custody of the child there would be a reconciliation. I thought the child would miss me, and I never thought Dr. Ane at that time would go through with the divorce."

Finally, plaintiff contends that Mrs. Ane should not be favored herein because she would keep the child, if granted custody, in the home of her stepfather in Shreveport who on one occasion made improper advances to the older daughter, Dorothy. On this point, when questioned by the district judge, Mrs. Ane testified:

"The Court:

"Q. Mrs. Ane, if this child Miriam is awarded to you, I understand you want to go to Shreveport; is that right? Or would you come here and have a home here at the court's order? Is that the way I understand your testimony? A. That is correct, your Honor.

"Q. You are living now with your mother and stepfather? A. Yes, but only on a temporary basis.

"Q. If the child is awarded to you, what would be your intention along those lines? What would you do with the child? A. I would, if the child were awarded to me, I would immediately make plans to set up a home either in Shreveport or here, whatever the court should decide, whatever the court would let me do."

Mrs. Ane further testified that she has sufficient funds from the property settlement to buy and maintain a comfortable home for Miriam and herself.

■ After our careful and thorough study of the record we are of the opinion that the evidence, considered in its entirety, does not establish that Mrs. Ane is either morally or mentally unfit, or otherwise unsuitable, for caring for her minor daughter, Miriam; and it follows that she must be given preference over plaintiff, under our settled jurisprudence, in the awarding of the child's custody.

Of course, as shown above, Mrs. Ane was highly nervous for the several years prior to October, 1949, when plaintiff maintained a separate residence; and occasionally, during that period, she perhaps was too severe in the disciplining of Miriam. But we do not believe that such nervousness, the cause of which was reasonably explained by Mrs. Ane, or the mentioned disciplining, affected adversely the child's health, disposition and general welfare. If it had, certainly the numerous disinterested neighbors and the child's attending physician, all of whom testified emphatically to the contrary, would have been aware of it. Too, if defendant had indulged in cruel abuse or undue mistreatment of the child, as the older daughter and the colored maid stated, Dr. Ane would have known of it; and with that knowledge he would not have made the allegation (quoted above) contained in his divorce petition filed January

6, 1949, that he was "entirely willing to have the said Miriam Marie continue to reside in the custody, care and control of her mother." Neither would he have given, during the course of the trial, the following testimony:

"Q. Aside from being in the house with the stepfather, you don't recall telling or writing Mr. Jerry Lambiotte during the year 1949, that you would be willing for the children to live with Mrs. Ane if they wished to live with her? A. That is correct. I still feel the same way, if both children wished to live with Mrs. Ane, but they didn't at that time and they do not today. I wouldn't attempt to hold my children against their will."

Since removing to Shreveport Mrs. Ane appears to have eliminated much of her previous nervousness. A graduate of Newcomb College in 1929 with an A.B. degree, she entered Centenary College on February 1, 1950, taking 15 hours of work with the view of obtaining a certificate qualifying her as a teacher in the public high schools. Her report card after one term of work (approximately four months) showed that she received A's in two history courses, one B and one C in two education courses, and a B in an algebra course, all of which are passing grades. If she were then highly nervous it is difficult to conceive that the college would have permitted her taking the post-graduate work or that she could have attained such marks. To be noticed also is the fact that while living in Shreveport she occasionally acted

as a baby sitter for other parents without any complaint on the part of the latter.

The conclusion that we have reached herein, which is that Mrs. Ane is not unsuitable for the care of her child, finds support in the formal judgment of the district court (quoted above). After ordering that the permanent custody be awarded to Dr. Ane, such judgment decrees that Mrs. Ane be granted the temporary custody from its date of June 14, 1950, until August 1, 1950, or for approximately one and one-half months, with permission to take the child to Shreveport. If Mrs. Ane is unfit for the child's care she is not entitled, it seems to us, to any custody, even temporary.

Also fortifying our conclusion is the report of Dr. Carl P. Adatto, a qualified psychiatrist appointed by the district court at the requests of both litigants to make an examination of Mrs. Ane. The report speaks for itself and reads as follows:

"Carl P. Adatto, M. D.
"3706 Prytania St.
"New Orleans 15, La.
"June 13, 1950.

"The Honorable A. E. Rainold,
"Civil District Court for the Parish of
    Orleans,
"State of Louisiana, Division 'F',
"New Orleans, Louisiana.

"Dear Judge Rainold:

"Mrs. Louise Jeanette Lambiotte Ane came to me for examination at your request. I saw her on three different occasions.

"I found her to be a rather tense woman who was predominately preoccupied with her feelings about her husband. She feels that he has been unfair to her; but despite that, she still loves him and hopes for an eventual reconciliation. She stated that she has trusted him implicitly in the past and only on the basis of a possible future reconciliation did she originally give him the custody of their younger child.

"I found nothing extraordinary in her past background that would indicate the presence of a severe emotional disorder. Her intellect was sufficient so that she graduated from Newcomb College.

"When I questioned her about the letters she wrote, she stated that these letters were more or less written impulsively and she meant no harm by them. Also she indicated they were somewhat of an expression of her unfulfilled love for Doctor Ane. She was rather circumstantial in discussing these letters and invariably would come back to the topic of how frustrated her marital life was.

"My impression of this woman is that she has many immature traits. The letters she wrote are characteristically those of an adolescent girl rather than a grown woman. Her judgment has not been the best in the past. However, I do not feel that she is psychotic, and I feel that even though she might not be the best mother in the world, she is capable of taking care of a child. She evidently has realized her limitations.

in the past, and gets necessary help for raising her children.

"Very truly yours,

"(Signed)      Carl P. Adatto

"(Typed)       Carl P. Adatto, M. D."

For the reasons assigned the judgment appealed from is annulled and set aside in so far as it awards the custody of the minor child Miriam Marie Ane to the plaintiff father, Dr. J. N. Ane, and it is now ordered that the permanent care, custody and control of the said child be granted to the defendant mother, Mrs. Louise Jeanette Lambiotte Ane, subject to the right of the plaintiff, at reasonable times and places, to visit the child and to have the child visit him. All costs of this proceeding in both courts are to be paid by the plaintiff.

HAWTHORNE, J., takes no part.