HAWTHORNE, Justice.
 

 Defendant, Mrs. Odette Heriard Kieffer, has appealed to this court from a judgment of the district court in favor of plaintiff, her husband, William Joseph Kieffer, Sr., granting unto him an absolute divorce on the ground of adultery and awarding to him the permanent care, custody, and control of their four minor children.
 

 The plaintiff in his petition charged his wife with having had adulterous relations with Theodore Victoriano, who resided next door to the Kieffers with a woman whom he represented to be his wife and who was generally known as Mrs. Victoriano. The specific acts of adultery upon which plaintiff relies were alleged to have occurred upon the nights of the 9th and the 19th of July, 1947, between the hours of 8:00 and 10:00 o’clock in a small shed located on the rear of the premises occupied by Theodore Victoriano. The plaintiff was normally at work during the hours when the alleged acts of adultery were committed. He was employed by the Sewerage & Water Board of the City of New Orleans from 7:00 a. m. to S :00 p. m. each day, and in addition worked from 6:00 o’clock in the evening until midnight at Pontchartrain Beach between April and Labor Day.
 

 After offering evidence to establish and prove the acts of adultery on the dates and at the time and place as alleged in his petition, plaintiff established certain facts and circumstances in corroboration of his proof of the acts of adultery. We shall discuss these corroborating circumstances at this time. For a long period of time defendant was a frequent visitor to the home of the corespondent. Almost daily she prepared and cooked the Victorianos’ meals and often washed and ironed their clothes. In the mornings, after her husband had departed for work, she often went to the home of the corespondent scantily clad, served him coffee, and prepared breakfast. Mrs. Victoriano’s health was poor, and she was confined to her bed most of the time. The defendant gave this as a reason for her numerous visits to, and the performance of her many services for, the neighboring household.
 

 According .to the testimony of Mrs. Victoriano, the conduct of the defendant and Victoriano caused comment and gossip among the neighbors., and she decided to ascertain for herself whether there was any truth in the things being said about them. On one occasion in the early part of July, 1947, between 6:00 and 7:00 a. m., after pretending to take some pills, evidently sleeping pills, given to her by Victoriano, she went to the back room of her house and saw Mrs. Kieffer and Victoriano lying together on a couch. Mrs. Kieffer had removed her robe and was clad only in a slip, and Victoriano had on a pair of khaki
 
 *156
 
 pants and an undershirt. As to her observation on this occasion she testified:
 

 “Q. Did you go into the room? A. I never went into the room. I didn’t have to. I looked in that glass [through the glass of the door],
 

 “Q.
 
 You saw what was going on? A. I seen what was-going on.
 

 “Q. And you made no attempt to stop it? A. No. What was the use? I was a sick woman. He had made a threat already that, if I interfered with him, what he would do me.
 

 “Q. You didn’t open that door and tell him that you saw him or anything?
 

 A. I told him afterwards.
 

 “Q. I mean at the time it was going on. A. I never.
 

 “Q. Did you see any actual action going on back there ? A. I did.”
 

 In the early part of September, 1946, plaintiff’s suspicion that his wife was behaving improperly was aroused because upon one occasion, after he returned from a shrimping trip with his son at about 6:00 o’clock on a Sunday morning, he went over to the Victoriano home looking for his wife and found her sitting in Victoriano’s lap. Subsequently on numerous occasions he urgently requested his wife to stop her constant visits and attention to Victoriano, but she refused to accede to his requests. She discontinued altogether marital relations with the plaintiff, and at her suggestion they occupied separate bedrooms. In an effort to prevent his home from being broken up on account of his wife’s conduct, plaintiff asked his lawyer and his brother to discuss the matter with his wife and to request that she discontinue her improper conduct with Victoriano. The lawyer wrote her a letter, and the brother went to see her and pleaded with her to refrain from her intimacy with Victoriano. Their efforts were likewise unavailing.
 

 With this background in mind, we now come to the evidence adduced by plaintiff to establish the specific acts of adultery alleged in his petition. On or about July 6, 1947, plaintiff employed private investigators to observe the actions of his wife during the hours when he was away from home at his work. These investigators stationed themselves near the home of plaintiff some six or seven nights, and on July
 
 9
 
 and 19 observed the defendant leave her home in the early hours of the night and go into a small shed located on the premises of Victoriano. She closed the door to the shed and remained inside for some 30’ to 45 minutes, during which time the shed was in total darkness. The testimony of these investigators was corroborated by that of Mrs. Victoriano and of the plaintiff, who had returned home without the knowledge of the defendant. They saw Victoriano leave his house, light a cigarette and wave it in the air as a signal to defendant, and go into the shed. Mrs. Kieffer then came from her
 
 *158
 
 house and joined him there. On the night of the 19th, the plaintiff turned on the light in his yard when the defendant left the shed, so that the investigators had a clear view of the defendant as she returned to her house and saw Victoriano standing in the door of the shed. One of these investigators made an inspection of the shed on the morning of July 10 and found on the floor a light blanket thrown over some sacks or rags and something which he thought was a pillow.
 

 After the occurrence on July 19, the husband left the common dwelling and up to the time of the trial of this case had never returned to reside there. Mrs. Victoriano likewise left Victoriano and was no longer living with him. She testified that she went to live with a sister when he ordered her to leave.
 

 At the time of the trial Mrs. Kieffer admitted that she had discontinued marital relations with her husband, and that he and others had requested her to refrain from her frequent visits to her neighbors’ home. She stated, however, that she ignored their requests because there was nothing wrong about her going there.. To us, the reasons she gave for making these visits are not impressive. There is nothing in the record to indicate that there was a bond of friendship between her and Mrs. Victoriano’ which would have warranted her constant attention, solicitude, and care. She denied any improper conduct with Victoriano and flatly denied going to and meeting him in the small shed. She even testified that she had no idea why her husband left their home and appears to us to have been indifferent and unconcerned about his leaving.
 

 Victoriano also denied the meetings in the' shed, and testified that he had no idea why Mrs. Victoriano, with whom he had lived for many years, had left him. In fact, he attempted to create the impression that there existed between him and Mrs. Kieffer only the casual relationship of ordinary neighbors, but his testimony is unconvincing in the face of her admissions that she was a constant visitor in his home and performed many services for him.
 

 Defendant-appellant sought to show, and argues here, that the investigators employed by her husband could not, from the vantage point at which they testified they had stationed themselves, have seen the shed in which the alleged acts of adultery occurred because of the location of various shrubs and fences. We cannot agree that defendant has successfully discredited the testimony of the investigators by her evidence, because the trial judge himself visited the premises, observed the surrounding conditions, and concluded that the plaintiff had established his case.
 

 In its final analysis, the outcome of this case depends upon the credibility of the witnesses. The trial judge, who saw and observed the witnesses, accepted the testi
 
 *160
 
 mony of the plaintiffs witnesses, and from our reading of the record we have concluded that he was correct in doing so.
 

 The law applicable to a case such as this, as announced by this court, is:
 

 “Due to the secrecy attendant upon the act of adultery, it can rarely be established by direct evidence, and the firmly established jurisprudence is to the effect that, ‘In actions for divorce, courts must take such evidence as the nature of the case permits, circumstantial, direct, or positive, and bring to bear upon it the experiences and observations of life, and thus weighing it with prudence and care give effect to its just preponderance’. Gauthier v. Matthews, 191 La. 326, 185 So. 272; Guidry v. Allemand, 216 La. 288, 43 So.2d 611, and authorities therein cited.” Massa v. Thompson, 220 La. 278, 56 So.2d 422, 423.
 

 Weighing all of the evidence in the instant case with prudence and care and giving effect to its just preponderance, we conclude that plaintiff has made out his case, and that the judgment of the trial judge granting to him an absolute divorce was correct.
 

 Under the provisions of Article 157 of the Civil Code and the jurisprudence of this court, the custody of a child whose parents have been legally divorced is left largely to the discretion of the trial judge under circumstances shown to exist when he is called upon to act. This discretion is not, however, unlimited but is subject to review and control by this court. Nevertheless, this court is reluctant to upset a judgment of the trial court in matters involving the custody of a child and will not do so except in cases where it is shown that the judge has abused the discretion vested in him. See Black v. Black, 205 La. 861, 18 So.2d 321; Sampognaro v. Sampognaro, 215 La. 631, 41 So.2d 456.
 

 It is also well established that the paramount consideration in determining to whom the custody of a child should be given after the divorce is the welfare and the best interest of the child, and under this rule this court has consistently awarded the custody of minor children to the mother unless she has been found to be morally unfit or unless she is incapable of taking care of the children. See Black v. Black, supra; White v. Broussard, 206 La. 25, 18 So.2d 641; Withrow v. Withrow, 212 La. 427, 31 So.2d 849; Sampognaro v. Sampognaro, supra.
 

 We cannot say that the trial judge abused his discretion in awarding the custody of the children to the father, under the facts and circumstances revealed by the evidence in this case and the situation which existed at the time of the trial — that is, the mother, a proven adultress and morally unfit, was living with her children in a house next to that of her partner in adul
 
 *162
 
 tery, whose common law wife had left him there alone.
 

 The decree awarding custody is not, of course, conclusive for the future in the sense that it can never be changed. See Willis v. Willis, 209 La. 205, 24 So.2d 378. The mother may in the future by proper proceedings he able to establish to the satisfaction of the court that her conduct over a period of time has been proper, that she is at that time morally fit, and that it is to the best interest of the children to be in her charge.
 

 For the reasons assigned, the judgment appealed from is affirmed, appellant to pay all costs.