133 So.2d 908 (1961)
Wesley BAASEN, Plaintiff-Appellant,
v.
Esther Helen Uelner BAASEN, Defendant-Appellant.
No. 9548.
Court of Appeal of Louisiana, Second Circuit.
October 26, 1961.
*909 Joseph R. Bethard, Shreveport, for plaintiff-appellant.
Love & Rigby, Shreveport, for defendant-appellant.
Before GLADNEY, AYRES and BOLIN, JJ.
AYRES, Judge.
Predicated upon charges of adultery directed against his wife, plaintiff instituted this action for a divorce and for the custody of the two minor children, issue of their marriage. In reconvention, on alleging cruelty and inhuman treatment of the husband toward her, defendant sought a separation, "a mensa et thoro," provisional and permanent custody of the children, alimony pendente lite for the support of herself and children, a dissolution and settlement of the community estate, and attorney's fees.
After trial, there was judgment granting plaintiff a divorce, but awarding defendant the custody of the minors and condemning plaintiff to pay alimony in the sum of $75 per month for the support of the children.
From the aforesaid judgment, both plaintiff and defendant appealed. Plaintiff's appeal is directed to that portion of the judgment awarding defendant custody of the minor children; defendant's appeal, toward that portion of the judgment granting plaintiff a divorce.
The issues presented by these appeals are factual in nature. Therefore, a brief statement of the pertinent facts is a prerequisite to an understanding and resolution of the questions presented.
Plaintiff and defendant were married August 26, 1953, in the State of Iowa. Of their marriage, two daughters were born, Paulette Ann and Rebecca Helen, presently about seven years and four-and-a-half years of age, respectively. They have lived in Shreveport about three years, where plaintiff serves as pastor of a local church congregation.
The marriage of these parties was beset by marital difficulties. For almost six months preceding their separation on June 20, 1960, these difficulties progressed to such a degree as to induce plaintiff to keep a daily diary on his wife's activities, particularly with respect to the hours of her arising in the mornings, the dates and hours of her leaving the household and return, the occasions she failed to cook the family meals or to attend to other of the household duties.
Defendant contends, with some evidence of reality, that plaintiff became so cruel in his treatment of her, such as by physically assaulting and beating her, that she felt impelled to leave the matrimonial domicile and seek quarters elsewhere, which she did, taking the children with her.
Testifying with reference to the matters contained in plaintiff's diary, defendant admitted that she did leave the residence, but that on many occasions she had to go to a local hospital for "shots." This, she could usually only do when plaintiff returned home and remained with the children. On other occasions, the children accompanied her. She testified that, because of illness, suffering from a kidney infection and pneumonia during the six-month period preceding their separation, she was confined to bed and was unable to prepare the family meals. She further testified that, during a two-year period, she had undergone major surgery on three occasions.
On leaving the matrimonial domicile, defendant took residence in an apartment *910 at 1108 Busby Street, where she remained until July 5, 1960, when she removed to another apartment located at 544 Jordan Street.
In support of his demands for a divorce, plaintiff relies upon the testimony of detectives employed to keep the defendant under surveillance. These witnesses, in testifying, reported they went to the apartment on Busby Street July 8, 1960, where they observed a man and a woman in the apartment with the shades drawn; that the lights were turned off in the apartment at 11:40 p. m. A Chevrolet car registered in the name of one L. W. Provence, a member of the United States Military Service of Barksdale Air Force Base, was parked in front of the apartment. At 7:30 the next morning, the car was observed at the same location. On that occasion, they knocked on the door of the apartment under the pretense of seeking information nowise connected with this case. Mrs. Baasen, at the time, was dressed in a nightgown and negligee, and the man in shorts and a T-shirt.
The next observation was made July 16, 1960. The car previously mentioned was parked out front at the apartment at 7:35 p. m. At 9:45 p. m., a man and a woman were seen in the living room dressed in shorts. The lights in the apartment were extinguished at 11:55 p. m.
Returning to the apartment the following morning, the witnesses observed the car had not been moved. Again, at 10:35 p. m., the man, dressed in trousers but no shirt, was observed in the living room; the defendant, dressed in shorts, was lying on the floor. Surveillance was continued until the lights were extinguished at 11:40 p. m. In the meantime, no one was seen leaving the apartment.
On various occasions, from July 16 to July 30, 1960, the car registered in Provence's name was parked at locations near the defendant's apartment.
Defendant, on cross-examination, admitted that she was acquainted with L. W. Provence, known as "Dub"; that he owned a turquoise and white automobile; that approximately four months prior to the separation, she met "Dub's" sister, who told her that "* * * she had a brother at the Base and he called me and said that he was Pearl's brother"; that defendant had met him twice at her home; that he came to her house and introduced himself; and that, when she left her home, she called "Dub." She further admitted, in her testimony, that "Dub" visited her at 544 Jordan Street and said that he was probably baby sitting for her. When asked if he was there when the lights were turned out, she answered: "We were not there, that I recall, with the lights out, no, Sir. He was probably there."
Proof of the aforesaid facts was sufficient to support a decree in plaintiff's favor for his principal demand. Such was the conclusion reached by the trial court.
From an analysis of the evidence in this case, we are convinced that it meets the test recognized in the jurisprudence and as reiterated in Pilgrim v. Pilgrim, 235 La. 112, 102 So.2d 864, 865-866, wherein it was stated:
"It is the well-settled jurisprudence that the unfaithfulness of a spouse may be established by indirect or circumstantial evidence forasmuch as, in the nature of things, adulterous acts can seldom be proven by direct or positive testimony. Coston v. Coston, 196 La. 1095, 200 So. 474; Guidry v. Allemand, 216 La. 288, 43 So.2d 611 and Kieffer v. Heriard, 221 La. 151, 58 So.2d 836. However, the circumstances and facts established must be such as to lead fairly and necessarily to the conclusion that adultery has been committed as alleged in the petition. Salles v. Salles, 187 La. 914, 175 So. 618; Clark v. Clark, 207 La. 606, 21 So.2d 758; Rayner v. Rayner, 216 La. 1099, 45 So.2d 637; Savin v. Savin, 218 La. 754, 51 So.2d 41; Meyer v. Hackler, 219 La. 750, 54 So.2d 7; Massa v.

*911 Thompson, 220 La. 278, 56 So.2d 422 and Arbour v. Murray, 222 La. 684, 63 So.2d 425. Indeed, it has been properly observed that `* * * the circumstantial proof in these cases must be so convincing as to exclude any other reasonable hypothesis but that of guilt'. Hayes v. Hayes, 225 La. 374, 73 So.2d 179, 180."
In the quoted case, in recounting and evaluating the testimony offered, the court stated:
"An analysis of the evidence in this case satisfies us that it meets the above stated testfor, coupled with the circumstance of intimate relations between the parties, who were living separate and apart from their respective spouses, and the many opportunities provided by them for the commission of adultery, is the fact of two nocturnal visits by Pilgrim to the house which the corespondent occupied by herself and their remaining therein in the dark for a length of time quite ample for the performance of the sexual act. All this adds up, in our opinion, to the inescapable conclusion that adultery must have been committed."
The evidence in the instant case, as detailed herein above, is as strong or probably stronger than the evidence in the quoted case, and it therefore warrants and justifies a similar conclusionthat the defendant must have committed adultery. Here, defendant and the alleged corespondent were on intimate terms. He visited her in her home. On her leaving the matrimonial domicile, she called him; and, while she was living separate and apart from her husband, the corespondent was present in her apartment on numerous occasions, at night and all night. These facts were amply established in the record.
For a reversal of the judgment of divorce, defendant cites and relies upon the cases of Meyer v. Hackler, 219 La. 750, 54 So.2d 7; Hayes v. Hayes, 225 La. 374, 73 So.2d 179. These cases are readily distinguishable from the instant case. In the first of these, evidence was given by four observers, one of whom was plaintiff's brother. Their testimony was that, at 9:40 p. m., a taxi stopped at a street corner near plaintiff's residence (plaintiff being absent at the time); that a man alighted from the taxi and walked into an alley common to plaintiff's and an adjoining residence; that, at 4:18 the following morning, they saw a man resembling the one seen the night before, leave the residence. It was pointed out, however, that the residence was of a type known as a double house, only one part of which was occupied by plaintiff and the defendant. From the character of this proof, at the very most, only bare suspicion of adultery could have been aroused.
In the second of the cited cases, in finding that the evidence fell short of establishing adultery on the part of the wife, it was said:
"* * * The most that can besaid is that Mrs. Hayes has been exceedingly indiscreet in visiting a single man in his apartment where the opportunity of committing adultery was, in the main, unrestrained. But, as stated in Savin v. Savin, supra [218 La. 754, 51 So.2d 45], `* * * for us to declare that they did, we must draw upon our imagination, and rule that whenever a man and a woman have the opportunity to, they do commit adultery'. This we cannot and should not do in the absence of other circumstances of such a nature as to make the conclusion fairly certain that the parties not only had the opportunity to commit the act but that they went to the place where it allegedly occurred for that purpose and that it was accomplished.
"Here, if we discard Mrs. Hayes' denials entirely (as it is evident that the trial judge did not believe her), there are no other links of impropriety intimately connected with her imprudent conduct which would fortify an *912 abiding belief that adultery was committed on either of the occasions she visited the apartment of Lawhon. Surely, her friendship with Lawhon extending over many years and her meeting him at a cocktail lounge cannot suffice." [225 La. 374, 73 So.2d 180.]
Remaining for consideration is the matter of the custody of the minor children, both girls of tender age, whose custody was awarded to the mother by the trial court.
In resolving this matter, certain well-recognized principles have been established in the jurisprudence. For instance, even though LSA-C.C. Art. 157 provides:
"In all cases of separation and of divorce the children shall be placed under the care of the party who shall have obtained the separation or divorce unless the judge shall, for the greater advantage of the children, order that some or all of them shall be entrusted to the care of the other party. * * *"
it was stated in Messner v. Messner, 240 La. 252, 122 So.2d 90, 93, that
"Under the law and settled jurisprudence of this State, the trial judge has the discretion of awarding the custody of a child whose parents are legally divorced in accordance with the circumstances existing when he is called to act. Although this discretion is subject to review and control by us, we are usually reluctant to reverse a judgment in these instances, unless we find and conclude that the trial judge has abused the discretion vested in him. Black v. Black, 205 La. 861, 18 So.2d 321; Sampognaro v. Sampognaro, 215 La. 631, 41 So.2d 456; Kieffer v. Heriard, 221 La. 151, 58 So.2d 836; Pepiton v. Pepiton, 222 La. 784, 64 So.2d 3.
"We have also consistently recognized that the paramount consideration in determining to whom the custody of a child should be given after the divorce, a complex and grievous responsibility which too often preys upon one's heart, is the welfare, happiness and best interest of the child. In doing justice to this principle this Court has consistently awarded the custody of minor children to the mother unless she has been found morally or otherwise unfit, or unless she is incapable of giving them proper care and guidance. Sampognaro v. Sampognaro, supra; Pepiton v. Pepiton, supra; Cannon v. Cannon, 225 La. 874, 74 So.2d 147; Salley v. Salley, 238 La. 691, 116 So.2d 296; Dungan v. Dungan, 239 La. 733, 119 So.2d 843."
Under a similar state of facts as exists in the instant case, the court, in Estopinal v. Estopinal, 223 La. 485, 66 So.2d 311, 313, pointed out:
"The law is well settled to the effect that in cases of custody of children, the mother is to be preferred unless she is shown to be morally unfit. The question posed here is, does the one indiscretion she has committed render her morally unfit? A person who is puritanically inclined would say that she is; one who is more practical would say she is not. Courts always endeavor, when possible, to take the practical view of such matters. We do not think that because of this one error in her life, grievous as it was, she should be deprived of the legal custody of the child, especially one of such tender age, requiring her care and attention more than that of a father. It is the child's own interest and welfare that is of paramount importance and we are sure that the district judge gave that matter due consideration when he held that at the time of the trial, the mother was not morally unfit to provide for its welfare. Should she prove to be undeserving in the future, the law has wisely reserved to the father the right to apply to the Court to have the decree of custody changed."
*913 The evidence adduced at the trial, with respect to the neglect by defendant of the physical welfare of the children does not appear to support plaintiff's contentions and the district judge who heard the evidence and who had the opportunity to and did observe plaintiff and defendant, as well as the children, was of the opinion they should be placed in the care of the mother. Considering and weighing all of the evidence with care and prudence, and giving effect to its just preponderance, and ever mindful of the best interest and welfare of the children, we cannot say that the trial judge abused his discretion or committed error in awarding the custody of the children to the mother under the facts and circumstances revealed in this record.
We may observe that the record discloses the mother and children are presently with her parents in the State of Iowa.
For the reasons assigned, the judgment appealed is affirmed.
Affirmed.