YARRUT, Judge.
This is an appeal by the divorced husband from an unsuccessful attempt to obtain custody of their three sons, ages 2, 5 and from his divorced wife, on the ground she was guilty of lewd and immoral conduct that made her unfit to continue their custody. The District Judge refused the husband’s demand with written reasons.
A separation suit was filed by the wife in September 1958, on the ground of abandonment. They were married in June 1949. The wife was granted a separation by default and awarded the three boys and $300.-00 a month alimony.
On March 14, 1960, the wife obtained a final divorce, permanent custody of the boys, and $200.00 a month alimony. The husband admitted she was entitled to the divorce and the permanent custody of the children, but sought and obtained a reduction in alimony from $300.00 to $200.00 per month. In addition, right of visitation was granted the husband for one day each week, to be mutually agreed upon; and visitation for the months of June, July and August.
Since his divorce, the husband, age 37, remarried a girl 22, and two children were born to them.
The present rule for custody was filed June 26, 1961. On three or four occasions following the judgments of separation and divorce, the wife had to rule her husband into court to compel payment of delinquent alimony.
The husband sought to prove by the testimony of four witnesses, principally one Ingram, that the wife openly committed acts of adultery at her home in the presence of the children; had illicit relations with many men; and was a narcotic addict.
The wife was engaged to marry Ingram, received an engagement ring and a lot of ground upon which they expected to erect a home after marriage. During the engagement Ingram testified, and the wife admitted, that they made automobile trips together with the children to her mother’s home in Iowa; to an aunt in Colorado Springs; to his home in Texas; and to Memphis, Tenn.; that while on the trips they stopped at motels, occupying two bedrooms, one by Ingram and the eldest boy, and the other by her and the two younger boys; that the door between was closed but unlocked because, being engaged to Ingram, she trusted him. She definitely and vehemently denied any illicit relations.
Another witness was one Bivins, a fellow-employee of Ingram, who testified he called at the wife’s home with Ingram one day and was introduced to the wife; that he left to buy beer and, upon his return to her home, had no trouble witnessing her adultery with Ingram, while the children were asleep in another bedroom.
A former maid testified that Ingram had a key to the wife’s home (which the wife frankly admitted), and that Ingram entered and left as he pleased; and, on occasions, the wife and Ingram fed intoxicating highballs to the children.
Another witness, Armstrong, operator of a liquor bar in the French Quarter in New Orleans and a crony of the husband, testified that, on many occasions, he had illicit relations with the wife.
The husband himself testified that, while living with his wife, and before the separa *217 tion and divorce, he was suspicious of her conduct and when he confronted her, she confessed she had been unfaithful, and named her accomplice. He also testified he saw automobiles parked late at night in front of his wife’s home, yet did nothing about it.
Notwithstanding this alleged confession, and other knowledge of her apparent misconduct, he continued to live with her and, in the subsequent separation and divorce actions, made no attempt to prevent her obtaining custody of the children. When questioned about this, he claimed he did not have sufficient evidence at the time.
Regarding the narcotics charge, an officer called at the wife’s home with a search warrant; she permitted him to completely search the premises. The officer left without any further ado. The wife vehemently denied this charge.
On behalf of the wife, she produced neighbors who testified to her good character ; her exemplary conduct with the children ; taking them to school and Mass; and otherwise conducting herself properly. They knew about Ingram, but assumed he was going to marry her and saw nothing untoward in his attention. They stated they would not hesitate to entrust their own children with her. A co-worker of the wife where the wife was employed at a medical clinic in New Orleans as a secretary, testified as to her promptness and good character.
In addition, the stepmother of the husband, who reared him from very early childhood, and the husband’s own sister, wife of a very prominent doctor, both testified that she was a fine mother, took care of the children, knew Ingram and saw nothing wrong in their conduct because they were engaged.
Ingram, notwithstanding all these alleged lurid acts of the wife, was still willing to marry her and would have done so if the engagement had not been broken off by the wife, because of his insane jealously and psychotic condition, requiring psychiatric treatment. Ingram admitted he threatened to expose her and deprive her of the custody of her children if she did not marry him.
The District Judge characterized the testimony of Ingram as being callous and not worthy of belief; was either fabricated or grossly exaggerated for reasons of revenge or vindictiveness, in furtherance of his threat to expose and deprive her of the children’s custody.
The witness Bivins, who testified witnessing immoral acts at the wife’s home, was characterized by the District Judge as a friend and fellow-worker of Ingram, just another tool of Ingram to carry out his threat to ruin the wife.
The testimony of Armstrong, the Royal St. bar operator, a business crony of the husband, was repudiated completely by the District Court.
The testimony of the maid in the wife’s household from 19S8 to 1960, was held by the District Court to be biased, because she had trouble collecting her wages, which she had not collected up to the trial, and because her husband had since become an employee of the husband.
In commenting on the testimony of the wife’s witnesses, the Judge summarized it it as substantially establishing the wife’s good reputation in her neighborhood and circle of friends, both in the manner of her conduct and the manner in which she was rearing her children; that the children were always neat in appearance, well-mannered, obedient, regularly attending church, well-fed, engaged in recreational activities, good students, and, in general, were of the type and disposition that made them desirable as playmates for their own children. The husband himself admitted that she maintained a clean and orderly home and that she was taking care of the children, except for the alleged acts of misconduct discussed above.
*218 After commenting on the testimony as above narrated, the Trial Judge concluded:
“After carefully considering all of the evidence presented, it clearly established that the defendant has been a good mother in attending to the care and needs of her children during the three years in which she has had their custody. No evidence with substantial probative value has been presented which would sustain the charge that the mother was guilty of immoral conduct of such a nature as to so materially and adversely affect the morals of her children, that the award of their custody to her care should be revoked and for their best interest and welfare granted to their father. The best interest and welfare of these children, unfortunate victims of the bitterness, rancor and hostility between their parents, dictate that the rule be dismissed and judgment is rendered accordingly.”
 With reference to the custody of children of tender years the jurisprudence is well-established that the mother should be awarded the custody unless she is proved physically, morally or mentally unfit. The courts are concerned primarily with the welfare of the children. Sharp v. Sharp, 228 La. 126, 81 So.2d 833; Estopinal v. Estopinal, 223 La. 485, 66 So.2d 311; Kieffer v. Heriard, 221 La. 151, 58 So.2d 836; Meyer v. Hackler, 219 La. 750, 54 So.2d 7; Sampognaro v. Sampognaro, 215 La. 631, 41 So. 2d 456.
The husband’s confessed knowledge of the wife’s alleged immoral conduct- before and during the suits for separation and divorce, in spite of which he remained silent and did not oppose the award of the custody to the wife, is too incredible to believe. At worst, the wife’s conduct with Ingram was indiscreet, rather than immoral.
The question of custody is always open for future inquiry. The record, as it stands, shows no present or immediate danger to the children’s health, morals or happiness while in the custody of their mother. If, at any time in the future, the husband is able to prove to the contrary, the courts are open for further inquiry.
For the reasons assigned, the judgment is affirmed; Plaintiff in rule, the husband, to pay all costs in both Courts.
Affirmed.