LANDRY, Judge.
This appeal is by plaintiff-husband, Bobbie Lee Robicheaux, from an adverse judgment rejecting and dismissing his action for absolute divorce from defendant-wife, Sydney Lee Justilian Robicheaux, on grounds of alleged adultery, and also denying appellant’s prayer for custody of the minor children of the marriage.
The sole issues presented by the instant appeal are purely factual in nature and involve (1) whether appellant has sustained the burden of proof of the adultery alleged; and (2) has appellee been shown to be morally unfit to retain custody of her minor children decreed by virtue of a judgment of separation a mensa et thoro obtained by her in a prior proceeding on October 19, 1962?
The alleged acts of adultery charged to appellee reputedly occurred in the City of Morgan City, where both appellant and ap-pellee resided, on the nights of December 21 and 22, 1962, and January 2, 1963, subsequent to appellee’s having obtained a decree of judicial separation from appellant. Although she denied having committed adultery, defendant, nevertheless, readily acknowledged that prior to the first alleged instance she had frequently dated the alleged respondent, Harry Portier, in the belief that Portier was an unmarried man. In this regard, both appellant and Portier frankly concede they patronized bars and lounges together “for a few drinks”, dined together and went for rides in Portier’s automobile but all for purely innocent and harmless social purposes. Portier likewise concedes that until after the alleged incident of December 12, 1962, he did not tell appellee that he was a married man with a wife and family in another city.
With the foregoing background in mind we shall proceed to a consideration of the evidence adduced by appellant in support of his accusation of adultery.
Plaintiff and his cousin, Paul H. Bou-dreaux, Jr., in essence testified that on the *552 night of December 21, 1962, they followed defendant and Portier to the latter’s apartment situated upstairs in the rear of an apartment house located at 210 South Railroad Avenue, Morgan City, and observed them enter the apartment at approximately midnight. Shortly after defendant and Por-tier entered the apartment the lights were extinguished and remained so until plaintiff and his cousin left at 2:00 A.M. During the aforesaid interval neither appellee nor Portier were observed leaving the building.
The following night, December 22, 1962, appellant and his said cousin again followed appellee and Portier to the latter’s apartment and observed them enter at 1:00 A.M. The lights in the apartment were extinguished about 15 minutes after the couple entered and appellant, desiring an additional witness, left about 1:30 A.M. and went to a nearby restaurant where he encountered an acquaintance and fellow employee, Weldon Morgan, whom appellant persuaded to participate in the surveillance. Appellant, his •cousin and Morgan returned to the apartment house and maintained their vigil until appellee and Portier were detected leaving the building at approximately 4:00 A.M. During this interval the lights in the apartment were not burning. As appellee and Portier prepared to approach Portier’s automobile to drive away, appellant turned on the lights of his own vehicle thus exposing and revealing appellee and her companion. Defendant and Portier immediately entered Portier’s car and drove away. Plaintiff immediately went to a telephone, called defendant’s father and reported to him what plaintiff had observed. Thereafter plaintiff and his acquaintances drove to defendant’s residence and observed all the lights burning.
On the night of January 2, 1963, plaintiff and his aforesaid cousin followed defendant and Portier to an establishment known as the “Dream Lounge” and observed the couple sitting in Portier’s automobile “smooching”, following which activity the couple entered the lounge and remained therein until approximately 10:15 P.M. Upon emerging from the lounge accompanied by defendant, Portier drove to a side road along Bayou Bouef, proceeded to a secluded dark spot, parked the vehicle, turned off its lights and remained there with appellee for an estimated interval of 45 minutes.
In addition to corroborating the testimony of plaintiff regarding the occurrences narrated, Paul H. Boudreaux, Jr. further testified he and plaintiff discontinued their surveillance at 2:00 A.M. on the night of December 21, 1962 because he, Paul H. Boud-reaux, Jr., had to work that day and could not stay any longer.
In substance Weldon Morgan testified that on the night of December 22, 1962, he stopped at the Blue Bird Cafe for a hamburger about 1:00 A.M., when plaintiff, an acquaintance and co-worker, entered and asked that Morgan accompany plaintiff as a witness. Morgan at first demurred but finally agreed upon plaintiff’s representation that plaintiff was unable to get anyone else at such an hour. He accompanied plaintiff to the apartment on South Railroad Avenue where they remained from about 1:15 until 4:00 A.M., at which time defendant and Portier came out of the building. Plaintiff drove up and turned the lights of his car on the couple whereupon appellee attempted to “duck down” behind another vehicle. At this point appellant told appellee to come out as “there’s no use hiding.” Defendant and her companion then entered a vehicle and drove away.
The correspondent Portier denies defendant was at his apartment on two occasions as alleged by plaintiff but acknowledges the visit on the occasion when appellant turned the lights of his automobile on as appellee and he, Portier, were leaving the apartment at 4:00 A.M. Portier admitted he and appellee had frequented bars and lounges together and had been keeping company rather frequently although he, Portier, was married and had not apprised appellee of his true marital status. He explained that on the night in question he patronized *553 a tavern operated by defendant’s father, Mr. Justilian, at which place his own vehicle ran out of gasoline. Portier borrowed Justili-an’s automobile to get some gasoline for his own vehicle and defendant, being present, accompanied him in her father’s car. After leaving, Portier and defendant decided to have a cup of coffee and went to a nearby restaurant where they met a mutual acquaintance, Audrey Blanchard, who was found to be feeling ill from a recurrence of “some kind of a fit” which causes her to “get stiff.” They offered to take Miss Blanchard home but she declined on the ground that it would upset her mother who was a “nervous” individual. Portier then suggested that Miss Blanchard be taken to his own apartment where she might remain until she recovered sufficiently that she could be taken to her own home without alarming her mother. At about 10:00 P.M., the three went to Portier’s apartment where appellee administered to her friend. Around midnight Portier and defendant left the apartment to go out for “a couple of drinks” and approximately one hour later returned to “check on Audrey” whom they then found quite ill and nauseated. He and defendant remained in the apartment with Miss Blanchard until 3 :30 A.M., at which time Miss Blanchard fell asleep. As he and defendant were leaving the apartment they were confronted by plaintiff which circumstance upset and excited defendant. After riding around with appellee for a short time, they returned to the apartment, picked up Miss Blanchard and brought her to her home. Portier explained that the lights were kept on in the apartment during the entire time he was present with the two women but could not be seen from the outside as he had no light in the kitchen and the door between the kitchen and bedroom was closed. He also related he had left a light on in the bathroom which was sufficient to light the bedroom but the bathroom light could not be seen from outside because of a heavy shade on the bathroom window. He denied any immoral conduct with appellee on any occasion whatsoever contending they were “just good friends.”
Regarding the incident of January 2, 1963, Portier testified as follows:
“A: Well, sir, I did take a ride with her, and the reason we did is because every time we turned around, he was behind me. He was following me no matter where I went. And on this particular night, I said ‘let’s take a ride and just see how far he will follow us’. And I rode down the highway and I crossed the overpass, I believe they call it Bayou Boeuf Overpass — I’m not familiar with the neighborhood — and I swung on around underneath and went down Bayou Boeuf Road, I think it is, and we came to a body of water. When we came to that, we turned around and came on back. And when I got back by the overpass, I stopped my car and turned the lights out for about fifteen or twenty minutes just to see if he was still behind us, and then we swung around on the highway and went back.
“Q : Did anything wrong happen then ?
“A: No, sir. I was in a little Metropolitan (sic), and all you can do is drive it.”
The testimony of Audrey Blanchard appearing of record is to the effect that on the night in question she was “getting upset, like a nervous spell” and went to the Blue Bird Cafe in search of her sister whom she intended to request to “take me to her house.” Unfortunately, her sister was not present and when defendant entered with Portier she asked defendant to take her to defendant’s home but defendant explained that would be unwise in view of the fact defendant’s home was unheated because the floor furnace was out of order. Portier then suggested they go to his apartment which they did at approximately 10:15 P.M. After ministering to *554 her, defendant and Portier left the apartment at about midnight. Appellee and her companion returned at approximately 2:00 A.M., left again and again returned at about 4:00 A.M. at which time they told her they had seen plaintiff and took her to her mother’s home. She further stated she knew Portier only casually but had known appellee well for about four years. Miss Blanchard’s mother had previously owned the bar then owned by defendant’s father. Miss Blanchard also stated she had formerly worked for defendant’s father and had been in his employ for approximately one month prior to trial of this matter.
Defendant stoutly denied having been intimate with Portier and maintained she had visited his apartment on one occasion only, namely, the instance when her acquaintance, Audrey Blanchard, was brought there ill. She explained that on this occasion she and Portier went in her father’s car to get fuel for Portier’s vehicle which had run out of gas. On the way to the gas station they stopped at a cafe where they encountered Miss Blanchard whom they found ill and took to Portier’s apartment. At about 11:30 P.M. they left Miss Blanchard at Portier’s apartment, returned Mr. Jus-tilian’s car, got into Portier’s car and-visited two bars. At about 12:45 A.M. they returned to the apartment to check on Miss Blanchard. When she and Portier emerged from the apartment only plaintiff and his cousin, Boudreaux, were present. She did not see Weldon Morgan. As to the incident of January 2, 1963, she denied that the place where they parked was dark or secluded. She further stated she and her companion were aware they were being followed by plaintiff on this occasion and decided to see “how far he would go” in checking on-their activities.
In oral reasons for judgment dictated into the record, the honorable trial court dismissed plaintiff’s action with the following observations and comments upon the degree of proof required in cases wherein divorce is sought on the ground of adultery:
“BY THE COURT:
“That’s a very serious accusation and it requires proof such that there can be very little doubt that adultery was committed. I recall some cases where the woman had gone to a man’s apartment and stayed a certain time — I don’t recall how long — and the Court’s (sic) refused to consider that that alone would prove by a preponderance of the evidence the charge made.
“It is my opinion that the plaintiff has failed to prove the charge of adultery by a preponderance of the evidence. Accordingly, let there be judgment dismissing his suit at plaintiff’s cost.”
 In summation, the jurisprudence is well established to the effect that adultery may be established by circumstantial as well as direct evidence but that in the nature of things the offense can seldom be established by direct or positive evidence. Because of the practical considerations involved a prima facie case of adultery is made upon the showing of facts or circumstances that lead fairly and necessarily to the conclusion adultery has been committed as alleged and that the circumstances revealed exclude any other reasonable hypothesis of the guilt of the accused party. Harris v. Harris, 228 La. 19, 81 So.2d 705; Hayes v. Hayes, 225 La. 374, 73 So.2d 179; Guidry v. Allemand, 216 La. 288, 43 So.2d 611; Coston v. Coston, 196 La. 1095, 200 So. 474.
It is equally well settled the character of the evidence must lead fairly and necessarily to the conclusion that adultery, as alleged, was committed. Harris v. Harris, supra; Savin v. Savin, 218 La. 754, 51 So.2d 41.
In urging our affirmation of the judgment rendered below esteemed counsel for defendant relies heavily upon the ruling in Hayes v. Hayes, 225 La. 374, 73 So.2d 179, which is alleged to be so factually *555 similar to the case at bar as to be controlling herein.
Our careful consideration of the cited authority, however, reveals it involves circumstances not analogous to those we find in the present instance. In the Hayes case, supra, the evidence disclosed the defendant visited the apartment of a male acquaintance on two occasions — once from 2:10 to S :20 P.M., and on the second occasion from 1:15 to 1:55 P.M. In addition, defendant had met her alleged accomplice twice at a cocktail lounge. Under such circumstances we have no quarrel with the court’s finding that adultery had not been established with that degree of proof required by the jurisprudence.
In the case at bar, however, we believe our esteemed colleague below erred in concluding that appellant had failed to prove the adultery alleged herein. In recapitulation of the evidence, it is conceded defendant and Portier frequently dated, dined together and accompanied each other to cocktail lounges and on drives. We believe the record fairly establishes defendant accompanied the correspondent to his apartment on both occasions as testified by plaintiff and his witnesses. Admittedly, one of plaintiff’s witnesses is a relative but we find nothing in the record to indicate the trial court rejected his testimony. On the contrary, the record indicates the trial court accepted plaintiff’s testimony but erroneously interpreted the evidence by concluding it was insufficient to establish commission of adultery.
In the case at bar we have a situation wherein defendant wife admitted dating her alleged correspondent on frequent occasions. In turn the correspondent conceded he did not advise defendant of his true marital status. His concealment of this vital fact cannot be ascribed to motives of purity and righteousness and can only be construed as having been intended to promote some ulterior design. We believe it unreasonable to suppose such an individual would not, given the opportunity, take liberties inconsistent with his own marital vows and compatible with an apparent purpose of such deception.
Defendant by her own conduct in attempting to conceal herself when detected leaving the apartment, and her excitement and loss of composure upon being so discovered in our judgment can but suggest a consciousness of guilt. If Miss Blanchard were actually present in the apartment as defendant would have the court believe, it would have been a simple matter for her and Portier to have explained this circumstance to plaintiff at the time defendant and Portier were observed leaving Por-tier’s apartment. Instead, defendant merely entered the automobile of her escort and drove away without explanation. Having been discovered under such compromising circumstances, we are of the opinion that if there were some logical explanation, it would have been forthcoming. In short, this court is of the opinion that the failure of defendant to explain the presence of Miss Blanchard in the apartment, under the circumstances related, is as incredible as the contention by defendant that Miss Blanchard was actually present.
Able counsel for defendant urges that the court should give less weight to plaintiff’s testimony because it is corroborated by a relative. In this regard it is argued Miss Blanchard, who corroborated defendant, was a totally disinterested witness. Granted that Miss Blanchard has no personal interest in the outcome of this litigation, nevertheless her testimony must be viewed in the light of her close personal acquaintance with defendant and her position as an employee of defendant’s father. On the other hand, Weldon Morgan, plaintiff’s witness, was totally unrelated to plaintiff by blood but was admittedly an acquaintance. His testimony convinces us he was a truthful witness.
While we do not believe adultery was established by the circumstances shown to have occurred on the night of January 2, 1963, we are of the firm opinion the inci-. *556 dents shown on the nights of December 21 and 22, 1962, lead fairly and necessarily to the conclusion adultery was committed by defendant on at least one, if not both said instances. In our judgment, the circumstances established exclude any other reasonable hypothesis except that of defendant’s guilt.
In seeking custody of the children, David and Marsha Ann, eleven and four years of age, respectively, appellant maintains defendant is unfit to retain custody granted in the action for judicial separation because appellee has, since the separation, worked in her father’s saloon and has otherwise demonstrated her moral unfitness.
Adulterous conduct on the part of a parent has always been condemned by the courts and, under certain circumstances, may constitute ground for the conclusion the guilty party is morally unfit to have custody of children. See Kieffer v. Heriard, 221 La. 151, 58 So.2d 836. Considering the conduct of appellee herein and especially in view of the fact that her answer to appellant’s petition contained only a general denial coupled solely with a prayer for dismissal of appellant’s suit and said answer is devoid of reconventional demand or alternative prayer for permanent care, custody and control of the children of the marriage, judgment will be rendered herein granting appellant permanent care, custody and control of the children of the marriage as prayed for by appellant.
Accordingly, it is ordered, adjudged and decreed the judgment of the trial court rejecting the demand of appellant, Bobbie Lee Robicheaux, for absolute divorce be .and the same is hereby annulled, reversed and set aside and judgment rendered herein in favor of said appellant, Bobbie Lee Robicheaux, and against appellee, Sydney Lee Justilian Robicheaux, decreeing an absolute divorce between said parties and dissolving forever the bonds of matrimony heretofore existing between them.
It is further ordered, adjudged and decreed the judgment of the trial court re-jectmg and dismissing the demands of appellant, Bobbie Lee Robicheaux, for permanent care, custody and control of the minors, David and Marsha Ann Robi-cheaux, be and the same is hereby reversed and set aside and permanent care, custody and control of said minors be and the same is hereby granted to appellant, Bobbie Lee Robicheaux.
Costs of these proceedings to be paid by defendant-appellee, Sydney Lee Justilian Robicheaux.
Reversed and rendered.