152 So.2d 291 (1963)
James A. MORRIS
v.
Nona Lee Jones MORRIS.
No. 5796.
Court of Appeal of Louisiana, First Circuit.
March 29, 1963.
*292 White & May, by Hamlet May, Baton Rouge, for appellant.
Brumfield, Turner & Cooper, by Robert E. Turner, Baton Rouge, for appellee.
Before ELLIS, LOTTINGER, HERGET, LANDRY and REID, JJ.
LANDRY, Judge.
Plaintiff, James A. Morris, instituted this action praying for absolute divorce from defendant, Nona Lee Jones Morris, on grounds of alleged adultery, and custody of the three minor children, issue of the marriage between the litigants at bar. Defendant wife filed an answer and reconventional demand denying the charges of adultery lodged against her and asking for judgment in her favor decreeing a separation a mensa et thoro between the parties because of their having lived separate and apart for more than one year. Defendant also prayed for custody of the children of the marriage.
The learned trial court rendered judgment in favor of plaintiff husband granting the divorce on grounds of adultery but awarded custody of the children to defendant wife. From the aforesaid judgment plaintiff has appealed complaining that our learned brother below erred in denying him custody of the children of the marriage. Defendant has answered the appeal contending the trial court erred in granting the divorce on grounds of adultery considering the record contains insufficient proof of such reprehensible conduct on her part. In addition, appellee contends our esteemed brother below also erred in not granting her reconventional demand for a separation predicated upon the parties having lived separate and apart for a period in excess of one year.
Judgment in the present matter was signed March 28, 1962, and plaintiff's appeal taken herein May 3, 1962. During the pendency of this appeal, plaintiff ruled defendant to show cause why the judgment of the trial court granting defendant permanent care, custody and control of the children should not be recalled and set aside and judgment rendered granting custody of said minors to appellant. On July 17, 1962, the learned judge of the court below vacated the aforesaid rule, denied plaintiff custody of the minors as prayed for and continued custody in defendant. From said unfavorable judgment, plaintiff has also appealed and both said appeals have been consolidated for hearing before this court.
In substance appellant maintains the trial court erred (1) in disregarding the provisions of LSA-R.C.C. Article 157 to the effect that the party obtaining the divorce is given custody of the minor children of the marriage unless it be shown that the welfare of the children require their custody be entrusted to the other spouse; (2) in concluding that the moral unfitness of defendant was not established by the evidence of record; and (3) in impeaching plaintiff's witness, Overton, without laying foundation for such action and predicated upon said impeachment regarding a collateral matter, rejecting in toto the testimony of such witness.
In answering this appeal, appellee contends the record is devoid of testimony proving adultery to a reasonable certainty. Able counsel for appellee forcefully argues that there is no direct evidence of adultery in the record and that the circumstantial *293 evidence adduced herein is not so convincing as to exclude any other reasonable hypothesis but that of appellee's alleged guilt. In this connection counsel for appellee argues that the trial court found defendant guilty of adultery on only one occasion and not on numerous occasions as contended by appellant. Countering this contention of appellee, appellant maintains the finding of the trial court was not limited and restricted to one instance of adultery only but that the reasons for judgment handed down by the learned trial judge indicate he concluded adultery was established on more than one occasion.
All evidence adduced by appellant to establish defendant's alleged adultery is circumstantial as is usually the case in matters of this nature.
In essence the present appeal presents two basic questions of fact, namely: (1) does the circumstantial evidence adduced herein establish appellee's alleged adultery so clearly and convincingly as to exclude any other reasonable hypothesis but that of her guilt; and (2) has defendant been shown by the evidence to be morally unfit or an otherwise unsuitable person to be awarded custody of her minor children? Stated otherwise, the latter question may be posed as follows: Does the record in the case at bar affirmatively show that the best interest and welfare of the minors involved will be served by depriving the mother at bar of the custody of her minor children and awarding the custody of said children to their father?
Plaintiff and defendant were married August 22, 1947, in Houston, Texas. Of the marriage three children were born, namely: James A. Morris, III (Speedy), Donald Craig Morris (Don) and Patricia Kay, ages 13, 11 and 6, respectively, at the time of trial in February, 1962. Plaintiff, a salesman, is approximately 41 years of age; defendant's age is 31 years. In April, 1954, plaintiff and defendant moved to Baton Rouge, Louisiana, where they resided together with their said children.
On August 10, 1960, defendant left the matrimonial domicile taking the children with her and establishing a separate residence in Baton Rouge. She filed suit for separation on September 15, 1960, alleging cruelty. Judgment was rendered therein rejecting her demand. The present suit for adultery was filed by appellant September 27, 1961. Following rendition of judgment granting appellant a divorce on March 28, 1962, defendant moved from Baton Rouge to Houston, Texas, where she presently resides with the children. It is undisputed that upon leaving the family home, defendant resided for a time on Hundred Oaks Avenue and later moved to an apartment at 2521 Olive Street where she lived from June 11, 1961, to mid-August, 1961. In about mid-August, 1961, defendant moved to a home situated at 654 Pierce Street where she resided until March 28, 1962, on which date she moved to Houston.
Appellant's petition specifically avers that between the dates June 11 and September 16, 1961, defendant committed adultery with one Ernest F. Harler (hereinafter somtimes referred to simply as "Harler") on several occasions, namely, June 11, June 16, June 29, June 30, August 6, September 15, and September 16, 1961.
In addition to contending that appellee's alleged adultery entitled him to the absolute divorce prayed for, appellant maintains that her conduct in this regard as well as certain other actions of appellee renders her morally unsuitable to rear the children of the marriage. In essence, appellant contends that besides committing the alleged acts of adultery in the home where the children were residing, appellee has otherwise led a completely immoral, irresponsible and prodigal life in that she permitted Harler and other male acquaintances to call upon her at all hours and remain in her home until the early morning hours while the children were present. Appellant further contends defendant has demonstrated her unworthiness as custodian of the children *294 by her constant drinking in their presence, her making love to her companions to the knowledge of the children, her mistreating the children by physically abusing them and her neglect of the children in general.
Defendant testified that after leaving the matrimonial domicile, she first lived on Hundred Oaks Avenue and subsequently moved into an apartment at 2521 Olive Street, a duplex. The apartment was a two story building consisting of two bedrooms and bath on the upper floor and the remaining facilities downstairs. On the ground floor the apartment had two doors, one on the front and the other at the side. There was no common entrance with the other unit of the duplex. Appellee, a secretary, earning $350.00 monthly, stated she first met Harler March 25, 1961, at a convention which she attended in conjunction with her employment. She acknowledged knowing Harler quite well but not intimately. Appellee admitted she frequently dated Harler knowing him to be a married man and the father of three children, aged 19, 16 and 14. Her dates with him averaged approximately three per month on which occasions he usually called at her home. She admitted Harler took her dancing and dining and also admitted being with him on June 15, June 29, June 30 and September 15, 1961, but denied seeing him August 6, 1961, on which latter date she explained she had other guests, namely, a Mrs. Gayles and one Cothern, an acquaintance of Mrs. Gayles. On June 11, 1961, appellee went out with Harler but upon observing that they were being followed, they returned to appellee's home and from there went to Harler's motel so that he could obtain a tie before going out to dine. Appellee went into Harler's room but left the door open. She and Harler remained in the motel room approximately five minutes.
Appellee did not recall exactly what she did on June 30 but she did remember that on one occasion she and Harler took the children swimming at the motel where Harler was staying. She denied that on this occasion her son, Don, observed her kissing Harler while they were seated on the edge of the pool. Appellee concedes that on September 15, she dined in public with Harler and later that same evening went dancing with him. She also conceded that on occasion she has cooked meals for Harler in her home. Although she admitted that Harler called at her home frequently and at all hours, on some occasions after midnight, and sometimes stayed as late as 3:00 A. M., she denied having been intimate with him. Appellee denied having dates with persons other than Harler but admitted she had been out to dine with John Holmes, a friend, and also Frank Hodges, a family friend. She also conceded that on June 7, 1961, Mr. Harler took her, Don and Kay to Kay's nursery school graduation and that on her birthday, Harler sent her a gift consisting of a cigarette lighter. Despite the evidence of Harler and two of the children to the contrary, appellee denied having indulged in any sort of love making whatsoever with Harler or any other man since her separation from appellant. She denied that Sam Overton (a detective employed by appellant to keep appellee under surveillance) visited her in her home on Olive Street, although she admitted Overton moved her furniture when she changed her residence to Pierce Street. After moving to Pierce Street, she admitted calling Overton on two occasions and requesting him to repair her stove and bed. On one of these occasions she picked Overton up at a bar sending her son, Don, into the establishment to summon him. Appellee corresponded regularly with Harler when he was not in Baton Rouge. On Harler's visits to her home they usually remained downstairs and kept lights on in the apartment. On one occasion, however, she and Harler watched television together upstairs in the bedroom but the boys were present in the room on this occasion. Appellee admitted that on June 29, 1961, while she and Harler were in the apartment downstairs alone, at approximately 1:00 A. M., the doorbell rang. *295 Appellee went upstairs to a window from which she could see the front door and upon observing a male caller whom she did not recognize, she sent Harler upstairs to the window to inquire what the caller wanted. The caller then inquired for a Mr. Stewart at 2125 Olive Street and was advised by Harler that he had the wrong address. Harler left sometime later. Asked what she and Harler were doing in her apartment until 2 or 3 A. M., she replied that they were merely passing the time of day. Appellee concedes it is her custom to take a drink almost daily upon returning home from work but that she does not drink to excess. Appellee acknowledged that the children were alone upon returning from school at approximately 3:00 P. M., until about 5:15 P. M., at which time she arrived at the residence after work. She admitted that she may curse infrequently but denied she did so habitually or in the presence of the children. She also denied leaving the children at home alone at night. Appellee denied physically abusing the children but she did admit she whipped them with a strap when necessary, her procedure being to take down their pants and administer a whipping with a belt.
The alleged corespondent, Harler, testified he has been married for approximately 20 years and resides in New Orleans with his wife and family. In general he corroborated the testimony of appellee regarding their relationship. He freely and candidly acknowledged his acquaintanceship with appellee stating he had dated her approximately 12 or 13 times. Harler was not aware whether appellant knew he was dating appellee. He gave little thought to what the children might think of his dating their mother while she was still married to their father. On several occasions he had breakfast dates with appellee in her apartment at her invitation. He never spent the night in appellee's apartment. He admitted calling at appellee's residence after midnight and on some occasions remaining until two or three o'clock in the morning. He also stated that appellee went to his motel room on two occasions: once in the company of another couple to imbibe cocktails and again on the occasion when appellee accompanied him there while he donned a necktie prior to their dining out. On the evening of June 29, 1961, he and appellee were watching the Jack Paar show on television in an upstairs bedroom when someone knocked at the door. Appellee did not wish to answer the door at such a late hour (it being then about midnight) so he went to the window, inquired what the caller wished. Harler admitted having given appellee a Christmas present and maintaining a regular correspondence with her by postcard. He considered appellee a friend only and stated he was not in love with her. Harler admitted hugging and kissing appellee several times including the incident at the swimming pool as testified to by one of the children. Although he acknowledged a "little friendly hugging and kissing", he did not consider he made love to appellant. Harler repeatedly denied that he ever was intimate with appellee but conceded their relationship was such that he occasionally became passionate.
Samuel E. Overton, Sr., a private detective employed by appellant, testified that he, his mother and two children moved into the apartment adjoining that of appellant on Olive Street to facilitate his assigned task of keeping appellee under surveillance. At 9:15 A. M. Sunday, August 6, 1961, Harler came to appellee's apartment and left between 10 and 12 A. M. in his station wagon accompanied by appellee and her daughter, Kay. The three returned and entered the apartment at about 6:00 P. M. By standing on a stepladder in his own apartment and peering through a hole in the ceiling, he was able to see into appellee's apartment through a similar hole in one of the upstairs rooms of appellee's place. (This testimony was shown to be false when the judge and attorneys went to the scene, examined the premises and determined that Overton could not see into appellee's apartment by standing on a ladder in his own side, but would have had to crawl into the *296 attic a distance of several feet in order to see into appellee's apartment through the hole to which the witness, Overton, referred.) In the aforesaid manner he observed appellee spank her daughter. Approximately five minutes thereafter the lights were turned off in appellee's apartment and about two hours later turned on again following which Harler departed. According to Overton, Harler visited defendant three or four times while she lived on Olive Street and on six to ten occasions after she moved to Pierce Street. On one occasion, he (Overton) and appellee visited Mrs. Gayles whose apartment was situated two buildings over. They remained in Mrs. Gayles' apartment partaking of several drinks until after midnight. Upon returning, Overton conversed with defendant for a few minutes and kissed her good night. A few days thereafter appellee informed Overton she was moving and Overton offered to assist so that he might continue his investigation. He rented a trailer with $10.00 given him by defendant for that purpose, attached it to his car, moved defendant's furniture and assisted her in getting settled in her new residence. Overton repaired her stove and the boys' beds. On one or two occasions they kissed while drinking together, one such incident occurring in the presence of the child, Kay. Overton further testified defendant told him she was in love with Harler; that she received mail from him at least once a week; that he often called her long distance when he was out of town and that he never failed to come to see her when he was in Baton Rouge. Appellee also showed him a bundle of approximately 25 postcards sent her by Harler. Appellee also told him about having dates with Harler and another man on the same week end and experiencing difficulty keeping them from meeting. He confirmed the incident on which appellee sent one of the children into a bar to get him and also related that appellee drank in the presence of the children. On infrequent occasions he observed appellee whip the children with a leather belt and was present when she cursed in their presence.
Glenn Hall, investigator, testified he had the Olive Street apartment under surveillance on June 11, 1961. At 8:50 P. M., Harler came out of the apartment, he having been there since 7:10 P. M. when surveillance commenced. Harler drove toward New Orleans, Hall following him as far as the Nesser Overpass.
Stewart R. Kennedy, Investigator, testified he investigated defendant's activities on three dates, only two of which revealed events of any significance. On June 16, 1961, he and an associate, Dauthier, commenced surveillance at 6:20 P. M. At 9:30 P. M. appellee left the apartment with a man. Apparently realizing they were being followed, appellee's companion drove a rather circuitous route around town eventually stopping at a motel and entering a room at 10:15 P. M. Kennedy and Dauthier then returned to appellee's apartment and observed appellee and Harler enter at 12:20 A. M. (midnight). They kept the apartment under surveillance until 2:30 A. M., during which interval no one left. On June 30, 1961, Kennedy and his associate commenced surveillance at 5:15 P. M. At 5:40 appellee and Harler left. They returned at 11:35 and Harler remained until 1:00 A. M.
Plaintiff testified that the family home which defendant left (and in which he would rear the children if given their custody) consists of 3 bedrooms, living room, den, dining room, kitchen and 1½ baths. His mother who lives in the next block is in good health, keeps plaintiff's home for him and would assist in rearing the children if plaintiff obtains their custody. Appellant is fully capable of caring for the children and desires their custody. Plaintiff's occupation is that of salesman with a net income of approximately $13,000.00 annually.
Astute counsel for appellant correctly contends our esteemed brother below *297 erred in rejecting in toto the testimony of Overton because he was shown to have testified falsely regarding a collateral matter, that is, concerning whether from his own apartment he could see into appellee's apartment by standing on a stepladder and peering through the attic. The matter concerning which the witness is shown to have testified falsely is purely collateral and incidental, whether he could in fact see into appellee's apartment from a certain vantage point is, in final analysis, a matter of no great concern. Especially so when the events he reportedly witnessed in such fashion are of relatively little significance as is the case in the matter before us.
Our jurisprudence is settled to the effect that if a witness testifies falsely to a material fact and there are no circumstances in the case tending to corroborate his evidence, the courts may properly reject his testimony in toto; but, however, the courts should not reject such portions of such a witness's testimony as may be corroborated by other credible and unobjectionable evidence in the record. Goynes v. St. Charles Dairy, La.App., 197 So. 819. Likewise, it has been held that the fact that a witness wilfully attempted to mislead the court in certain particulars throws suspicion on his entire testimony but does not necessarily require that his testimony be disregarded in its entirety. Smith v. York, La.App., 152 So. 152.
In the case at bar, except in the instance shown, Overton's testimony in virtually every other respect was confirmed by the testimony of appellee and Harler, especially with regard to the dates and circumstances of Harler's visits to appellee's apartment. Under such circumstances, our learned brother below improperly rejected Overton's evidence in toto.
The jurisprudence of this state is well established to the effect that adultery of a spouse may be established by indirect or circumstantial evidence considering the very nature of the act makes positive or direct evidence thereof most difficult. Coston v. Coston, 196 La. 1095, 200 So. 474; Kieffer v. Heriard, 221 La. 151, 58 So.2d 836. Learned counsel for appellee correctly argues that to establish adultery by circumstantial or indirect evidence the facts established must be such as to lead fairly and necessarily to the conclusion that adultery has been committed. Salles v. Salles, 187 La. 914, 175 So. 618; Arbour v. Murray, 222 La. 684, 63 So.2d 425. Likewise, counsel correctly argues that it has been held circumstantial proof of adultery is similar to proof of guilt in a criminal proceeding inasmuch as such evidence must establish guilt of the party accused to the exclusion of every other reasonable hypothesis. Hayes v. Hayes, 225 La. 374, 73 So.2d 179; Pilgrim v. Pilgrim, 235 La. 112, 102 So.2d 864; Baasen v. Baasen, La.App., 133 So.2d 908.
Relying primarily upon Bosch v. Bosch, La.App., 143 So.2d 284, esteemed counsel for appellee argues the trial court erred in concluding appellant has sustained the burden of proof incumbent upon him to establish defendant's alleged adultery by circumstantial evidence showing such conduct to the exclusion of every other reasonable hypothesis except that of appellee's guilt. With this contention we do not agree.
In the case at bar, defendant, a married woman, knowingly kept company with a married man who was the father of three children. By appellee's own admission her paramour visited her every time he came to town; he was free to and did call upon her at her residence at any time of day or night and did in fact on more than one occasion call upon her after midnight. Appellee maintained a written correspondence with Harler and accepted a birthday and Christmas gift from him. She permitted him to take her and her children on outings and accompany her and her daughter to a school function. Although appellee denied she ever embraced Harler or permitted *298 him to kiss her, on this score she is contradicted not only by Harler but also Overton. The record leaves little doubt but that Harler enjoyed the freedom of appellee's residence often remaining there until the early morning hours. Although Harler denied having intimate relations with appellee, he frankly admitted that his contract with her was such that at times it aroused his passion. Both appellee and Harler conceded that on several occasions they were together in appellee's apartment until the early morning hours. In fact our careful reading of the record in this case reveals that appellee and Harler admitted virtually all of appellant's evidence denying only that they committed the act of intercourse itself. We believe the record herein fairly and reasonably shows, to that certainty required by law, that the opportunity and inclination to commit adultery has been established. We further believe that considering the relationship of the parties as hereinabove set forth, we can only conclude, as did our brother below, that appellee has been shown guilty of the adultery charged.
We shall next consider the question of custody. While it is quite true that Article 157, LSA-R.C.C. expressly provides custody of minors shall be awarded to the spouse obtaining the separation or divorce, it does not follow, as argued by learned counsel for appellant, that the jurisprudential rule that the mother is preferred in custody matters unless shown to be morally unfit, is in conflict with the aforesaid codal authority. We concede the well established principle of law that with respect to the custody of children, (especially those of tender years), the mother is preferred unless shown to be morally unfit or otherwise unsuitable. Ard v. Ard, 210 La. 869, 28 So.2d 461; Guillory v. Guillory, 221 La. 374, 59 So.2d 424; Hathorn v. Hathorn, 237 La. 554, 111 So.2d 770. The rationale of the rule has been so often stated no practical purpose would be served by our reiterating it herein. The hereinabove cited authorities likewise establish the rule that the preference given the mother in such matters is subject to the exception and rule that in custody cases the paramount concern of the court is the best interest and welfare of the children concerned. Accordingly, it has been held on more than one occasion that even though there may be no proof of moral unfitness, a mother will be denied custody of children of a marriage in the event it appears she either can not or does not provide a proper and wholesome homelife and atmosphere in which to rear the children. Matheny v. Matheny, 205 La. 869, 18 So.2d 324; State ex rel. Magliore v. Saragusa, 229 La. 967, 87 So.2d 309; Hathorn v. Hathorn, 237 La. 554, 111 So.2d 770.
We believe the aforesaid jurisprudential rules in effect in our state accord with rather than contravene the provisions of Article 157, LSA-R.C.C. It will be readily noted that the article itself recognizes the paramount issue in custody cases to be the welfare of the children involved. Since the courts are thus directed to award custody predicated upon the best advantage and welfare of the children of a broken marriage irrespective of which spouse obtains the separation or divorce, the rule herein assailed by learned counsel for appellant clearly recognizes that in most instances the welfare of children is best served by placing them in the mother's care regardless of whether the father or mother obtains the divorce or separation.
In awarding appellee custody of the children our learned brother below did so principally on the basis of the ruling in Estopinal v. Estopinal, 223 La. 485, 66 So.2d 311, to the effect that a single act of adultery is not sufficient to render a mother unsuitable as custodian of her minor children. However, while the oral reasons for judgment handed down by our brother below relate primarily to one particular instance, namely, June 29, 1961, his reasons as a whole indicate he was convinced adultery was committed on more than one occasion. *299 We are in accord with this conclusion for the reasons hereinbefore set forth.
We believe that in denying appellant custody of the children involved on the basis of the rule established in the Estopinal case, supra, our esteemed brother below fell into error.
In the case at bar the record reflects that after leaving the matrimonial domicile appellee though married and the mother of three children openly and publicly embarked upon a course of repeated indiscretions in total defiance and disregard of moral principles including her deliberate and willful involvement with a man known to her to be married. The illicit relationship thus established and continued for a period of months was such that appellee's paramour was free to call at her home any hour of the day or night, irrespective of whether appellee's children, ages approximately 12, 10 and 5 at the time, were present. Apparently Harler enjoyed the freedom of appellee's home virtually to the extent he were her husband. On at least two occasions he assumed the role of husband and father by taking appellee and the children on outings or school functions. Neither appellee nor Harler denied that they frequently drank in the presence of the children and Harler conceded that on at least one occasion he kissed appellee in the presence of the children. Appellee herein made not the slightest effort to conceal the illicit affair from her children but on the contrary, repeatedly received and entertained Harler in their presence. It is fair to assume that the children, especially the boys, must indeed have wondered concerning the relationship between their mother and her frequent visitor. Appellee willingly accompanied Harler dining and dancing in public places on numerous occasions, often returning to her home with him late at night where he remained until all hours of the morning. Such utter disregard for the rules of propriety and decorum can but have an ill effect on the children involved. It is obvious to us that such an atmosphere is not conducive to the best interest and welfare of the children. Appellee herein was not guilty of a single indiscretion but of a calculated continued course of misconduct extending over such a period and of such open and public nature as to render her unsuitable as a custodian of her children. Byrd v. Byrd, La.App., 128 So.2d 794; Salley v. Salley, 238 La. 691, 116 So.2d 296.
It follows that the judgment of the honorable lower court awarding custody of said minors to appellee herein is erroneous and is hereby reversed and set aside and judgment rendered herein in favor of appellant, James A Morris, granting him permanent care, custody and control of the minors, James A. Morris, III, Donald Craig Morris and Patricia Kay Morris.
The conclusions herein reached and the judgment herein decreed render moot appellant's appeal in the companion case entitled Morris v. Morris, La.App., 152 So. 2d 299.
Affirmed in part, reversed in part and rendered.
Amended and affirmed.