CHEHARDY, Judge.
Plaintiff-appellant, James M. Cancienne, on December 15, 1978, filed suit for divorce against his wife, Fay Ann Ziegler Canci-enne, on the ground of adultery, and for custody of the 13-year-old child of the marriage, Melissa.
*844 Defendant-appellee answered and reconvened for a separation from bed and board on abandonment and cruel treatment and additionally, sought custody of the minor child, alimony and child support.
The custody rule was heard on January 5, 1979 before Judge Richard H. Gauthier, and temporary custody of Melissa was granted to Mr. Cancienne. In giving his reasons from the Bench, Judge Gauthier explained that “ * * * while adultery has not been proven, the appearance of adultery has. I do not feel that the situation that is now existing * * * is the correct type of family situation to bring up a young girl * * *He added, however: “This is only a temporary thing. I believe the proper upbringing of a young lady is with her mother. Should your wife straighten out and do the right things, I will lean towards giving Melissa back to her.”
Trial on the merits was delayed due to the recusation of Judge Gauthier and was then heard on May 11, 1979 before Judge Melvyn J. Perez, who found that adultery had not been proven, and awarded custody of Melissa to Mrs. Cancienne. Relative to the defendant’s reconventional demand, Judge Perez decreed a separation from bed and board based on mutual fault.
As per agreement and stipulations between the parties, he also ordered Mr. Can-cienne to pay Mrs. Cancienne alimony and child support in the amount of $628 per month, out of which Mrs. Cancienne would pay the house note of $128.
Pay and James Cancienne had been married for more than 20 years and two children had been born of the marriage: Melissa, 13 years of age, and Deborah Ann, 18 years of age. Both parties testified there had been problems in the marriage for many years. In the latter part of 1978 Mr. Cancienne complained to his wife about the presence of 22-year-old Timothy Lutz (a friend of her 18-year-old daughter’s ex-boyfriend), who was a constant visitor to the Cancienne home.
On December 13, 1978, while Mr. Canci-enne was supposedly on a business trip, two of his friends watched the family home overnight from a vantage point across the street.. During the evening both testified they saw a young man drive Mrs. Cancienne and Melissa home, enter the residence, and the next morning saw the young man leave looking a bit disheveled, as if he had just gotten dressed. One of the observers, however, also testified he noticed activity in the home before the three arrived on the evening of December 13, indicating the presence of another person in the house that night.
This testimony was not contradicted by Mrs. Cancienne, who admitted that Lutz did spend that particular night at her home, that he lived in her home from then until January 4, 1979, that she loved this man and frequently hugged and kissed him in front of her children, and that they often prayed together in her bedroom.
Testimony at the custody hearing in January 5, 1979 established Mrs. Cancienne allowed Lutz to move into the Cancienne family home, to keep his clothes there, eat his meals and sleep in the family home for more than a total of two weeks. Mrs. Can-cienne admitted she spent extended periods of time with Lutz behind locked bedroom doors. She contended that during these intervals in the bedroom their time was spent in prayer.
Subsequently during trial on the merits in May of 1979, Mrs. Cancienne repeated her earlier testimony concerning Lutz’s living at the Cancienne family home and admitted that, although Lutz now lives in his own apartment, she visits with him in his apartment at least three times each week and is, on other occasions, in his company.
Reverend Marvin E. Gorman, pastor of the First Assembly of God Church which Mrs. Cancienne and Lutz attend, in response to a letter from Mr. Cancienne complaining about his wife’s activities with Lutz, stated in part in a letter to Mr. Canci-enne, dated December 15, 1978:
“This week I met with Faye and Tim and talked with them privately as well as together concerning the seriousness of the problems that have developed because *845 of their relationship and involvement. I told them they would have to either break off their relationship or leave the church. It is very hard for a pastor to take this kind of stand because I love people, but I cannot condone such immoral relationships.”
Properly the pastor would not disclose in testimony his conversation with Mrs. Canci-enne and Lutz; however, his letter, admitted in evidence, is suggestive that Reverend Gorman believed more than a platonic relationship existed between Lutz and Mrs. Cancienne.
It is our opinion that the trial court should have granted Mr. Cancienne a divorce on the ground of adultery. In view of the strict requirement on this court to show the manifest error which causes a determination to reverse the finding of fact of the trial judge, we should like to quote excerpts of testimony from Mrs. Cancienne, her daughters and Mr. Cancienne.
Mrs. Cancienne testified at the hearing for custody on January 5, 1979 as follows:
“Q Did Reverend Gorman tell you you would have to break off your relationship with Tim or leave the church?
A Yes. But, he told me if I came to church alone, I didn’t have to break it off. He told me as far as Tim and I coming to church together, he would have to find a better way to get there. But, if I came alone he never said he would put me out.
Q Did he tell you, and I am quoting Reverend Gorman, T cannot condone such immoral relationship’?
A Right.
Q He said that to you?
A Yes.
Q Now, Timothy Lutz, did he spend the night at your house on Monday, December 4th, 1978, when your husband was away on business for Kaiser?
A Um — that was the first time, yes.

Q Did you tell your husband that Timothy Lutz spent the night there?
A No.
Q Were the two girls in the house?
A Yes.
Q Were they in the house all night?
A Yes.
Q Was Timothy Lutz there all night?
A Yes. He was locked in my bedroom.
* * * * * *
Q Since the papers were served, which was I think December 15th, the day after that, approximately how many nights did Tim spend in the house with you and the child?
A I don’t know.
Q Would you say four or five times a week?
A Well, Tim does not have any place to stay anymore. He has no job and no place to stay.
Q He stays there everyday?
A Yes.
******
Q Are you furnishing him food?
A Yes.
Q Does he have his clothes at your house?
A Yes, some. Just the clothes he has to wear to change everyday.
******
Q Are you having physical relations and making love?
A The only thing I do is kiss him.
Q Have you ever—
A No.”
At the custody hearing Mr. Cancienne testified:
“Q Did your daughter tell you prior to filing this suit for divorce on the grounds of adultery, did she tell you about Tim taking baths and walking around with only a towel on?
A Yes.
Q Did she object to it?
A Yes.
*846 Q Which daughter told you about it?
A The nineteen year old.”
Testimony given by Deborah Cancienne at the custody hearing on January 5, 1979 was:
“Q When did your father move out?
A I really don’t remember. I think the 14th of December.
Q Now, do you know who had spent the night there the night before, at your house?
A Timothy Lutz.
Q And your mother was there?
A Yes, sir.
Q And was your thirteen year old sister there?
A Yes.
Q Tim spent the entire night?
A Yes.
Q Had he spent the night previously there?
A Yes.
Q How many times, approximately?
A Ever since my dad left he had been staying.
Q If I understand you correctly, from December 14th until now?
A Yes.

Q Have you see your mother and Tim kissing?
A Yes.
Q On many occasions?
A Yes. When I was going out with Roland, too.
Q Does this go on everyday?
A Yes.
Q Has your mother said to you that she is in love with Timothy?
A Yes, sir.
Q Have you observed anything to make you think that Timothy is in love with your mother?
A He is.
# * sf: * $ ^
INTERROGATION BY THE COURT:
Q Miss Cancienne, have you ever seen your mother and Timothy doing anything else but kissing?
A Just hugging. I never did see anything else.
l|(
Q You are living in the same household with your mother, sister, and Tim?
A Yes.
Q Do you ever see them go into the bedroom together?
A Yes.
Q Do they close the door?
A Yes.
% # # # H* #
BY MR. TAPPER:
Q Miss Cancienne, you said you have seen them go in the bedroom and close the door?
A Yes.
Q How long ago was that?
A Yesterday. They go in there and pray and all. We have to knock before we enter and my mother never did tell us to do that before.
Q You go in there and knock?
A I got to knock first and they tell me to come in.
Q How long does it take?
A Just a few minutes. Sometimes they lay on the bed next to each other. One time I opened the door. Usually they kiss. I never did see them do anything.
Q You have walked in on them?
A Yes.
BY THE COURT:
Were they fully clothed?
BY THE WITNESS:
Yes.
BY MR. TAPPER:
$ $ # * ‡ #
Q Have you and Melissa seen your mother, while Tim was there, in a condition other than being fully clothed?
A Only when Tim was in a towel.”
*847 Melissa Cancienne testified at the hearing on the custody rule:
“Q And do you know who Tim is?
A Yes.
Q Who is he?
A My momma’s boyfriend.
Q And how long has Tim been living in the house?
A A couple of weeks.
******
Q Does he keep his clothes in the house?
A Yes.
Q Does he use the telephone and utilities and electric and water as he pleases?
A Yes.
Q Does he spend the night most of the time?
A All of the time.
******
INTERROGATION BY THE COURT:
******
Q Have you ever seen your mother and Tim doing anything to lead you to tell me that they are boyfriend and girlfriend?
A No, sir.
Q Have you ever seen them kissing?
A Yes.
Q Anything else?
A No.
Q Have your ever seen them in the room together by themselves?
A Yes.
Q Do they sometimes close the door?
A Yes.
Q Have you ever walked in on them?
A Yes.
Q What were they doing?
A Talking.
Q Have you ever seen them laying on the bed together?
A Yes.
Q Were they clothed or unclothed?
A Clothed.
Q Have you ever seen your mother and this boy, Tim, having anything of a sexual relationship?
A No.”
At the end of the hearing for custody the court in awarding temporary custody to the father observed:
“BY THE COURT:
* * * The court, on the basis of the ( evidence that came out today feels that while adultery has not been proven, the appearance of adultery has. * * * Now, in the future should Mrs. Canci-enne decide that she wishes to purge herself of the type of situation that she is involved in with the young man, upon doing that, Mr. Tapper is to advise the court that he will petition for custody again. * *
Subsequently at the trial on the merits in May 1979 substantially the same testimony was elicited. However, the record does disclose that since January 5, 1979, Timothy Lutz has been living in his own apartment, but the close relationship continued to exist between Lutz and Mrs. Cancienne.
Of particular importance is Reverend Gorman’s testimony at the trial on the merits regarding his letter to Mr. Cancienne referred to above:
“Q Reverend Gorman will you tell the court in your own words what you know of Tim and Fay?
A Let’s stick strictly with the contents of the letter. My conversation with them privately and both together at which time they divulged something to me that I based my letter upon. The contents of the letter was based upon the time of counsel I spent with them and not something that I thought of or surmised or what have you. It is based on their personal testimony to me.
Q Did you in fact ask them to leave your church?
A I did. Unless the relationship was broken off. I told them I would work with them in any way possible *848 to help them to re-adjust and try to be a Pastor to them. Both of them agreed with me that they would do such but then later decided against it.
Q Did you state, I cannot condone such immoral relationships?
* * * * * *
A I did make the statement to both of them, individually and together.”
At the trial on the merits Mrs. Cancienne stated:
“Q Has he spent any night since January 5, 1979?
A No. Because he would not do anything to hurt me or to cause me to lose my children.
Q Have you gone out with him since January 5, 1979?
A Yes.
Q And how often?
A To church.
Q And how often has that been?
A Two or three times a week.
Q Are you still going to church with Timothy Lutz?
A Yes, sir.
Q When was the last time you saw him?
A Yesterday.
* * * * * *
Q Have you been to his apartment?
A Yes.
* * * * * *
Q Well, say the past week, how many times have you been to his apartment in the past week?
A Three times.”
Melissa Cancienne testified at the trial on the merits:
“Q Melissa, when your mother and Tim — when Tim spent the night over there were you all at home?
A Yes.
Q Did your mother and Tim ever lock the door to the bedroom and forbid the children from entering?
A No.
Q Never?
A They locked to pray and all that. But I would look under the door. They weren’t doing nothing.
Q You would look under the door?
A Yes.
Q How often did you look?
A I stayed there until they opened it.
Q Did on one occasion you slide a mirror under the door?
A Yes, me and my sister.
Q Did you see your mother and Tim kissing?
******
Q Did you see them kissing?
A Behind the door?
Q No in the home?
A Yes.
Q Did you see them watch television together?
A Yes.
Q Did Tim have his head on your mother’s lap while they were watching television?
A Yes, sometimes.
******
Q Does your mother in your opinion love Timothy?
A Yes.
******
Q Did your mother hug and kiss Tim in the presence of yourself?
A Yes.”
Deborah Cancienne gave the following testimony at the trial on the merits:
“Q Let’s be a little more specific than that. I think you know why we are here. Is Timothy Lutz your mother’s boyfriend?
A Yes he is.
Q Has Timothy spent the night in the house with your mother and yourself?
A Yes, sir.
Q Has he done that on several occasions?
*849 A Yes, sir. He has.
* * * * * *
Q December 14th to January 4th a period of two and a half weeks you recall whether or not Timothy spent each and every night in the house?
A Yes he did.
Q Did you spend the night in the house?
A Yes, sir.
Q To your knowledge, did Melissa spend the night in the house?
A Yes she did.
* * * * * *
Q Have you ever seen your mother kiss Timothy?
A Yes.
Q Does your mother watch television with her head lying in the lap of Timothy?
A No she cuddles on his shoulder.”
The adultery of a spouse may be established by indirect or circumstantial evidence considering that the very nature of the act makes positive or direct evidence thereof most difficult. See Udin v. Levin, 273 So.2d 56 (La.App. 4th Cir. 1973), and Morris v. Morris, 336 So.2d 254 (La.App. 1st Cir. 1976).
In Udin, supra, the court reversed the trial court and awarded the appellant a judgment of divorce on the ground of adultery. In that case Mrs. Udin had been seen alone with the co-respondent in his apartment for a number of hours on several occasions after the lights had been extinguished. The court said at page 58:
“We have detailed the foregoing testimony because it is significant in a number of respects. For instance, the parties do not deny that they were together in the apartment at the times alleged in the petition and they readily concede that there were occasions when the two spent the night together in the co-respondent’s apartment. Also, it is apparent that this couple maintained a very close personal relationship during the period of time when the acts of adultery allegedly were committed and in fact their relationship was so close that it was characterized by the co-respondent as ‘romantic’ and was consistent with the wife’s statement of her own intention to be married to the co-respondent. Such circumstances certainly render applicable the following language in Morris v. Morris, La.App., 152 So.2d 291, cited with approval in Poole v. Poole, La.App., 189 So.2d 75:
‘. . . Both appellee and Harler conceded that on several occasions they were together in appellee’s apartment until the early morning hours. In fact our careful reading of the record in this case reveals that appellee and Harler admitted virtually all of appellant’s evidence denying only that they committed the act of intercourse itself. We believe the record herein fairly and reasonably shows, to that certainty required by law that the opportunity and inclination to commit adultery has been established . . . ’”
In explanation of the burden of proof that a husband must bear in a suit charging his wife with adultery, the court said in Bynum v. Bynum, 296 So.2d 382, 386 (La.App. 2d Cir. 1974):
“In Karl v. Karl, 191 So.2d 674, 675-676 (La.App.2d Cir., 1966), we emphasized certain principles which are appropriate here. There we stated:
‘The rule is well established in the jurisprudence of this State that a wife’s innocence of immoral acts is presumed; that the burden is upon the husband, in charging her with immorality, to establish the adulterous relationship by either direct or circumstantial evidence; and that, if circumstantial evidence is alone relied upon, the proof must be so convincing as to exclude any other reasonable hypothesis but that of guilt. * .
We can only conclude that the evidence presented establishes the legal certainty required to prove Mrs. Cancienne is guilty of adultery and plaintiff should be granted a divorce a vinculo matrimonii.
*850 We therefore reverse that portion of the judgment dismissing the demand of James M. Cancienne and order that a divorce a vinculo matrimonii be granted in favor of James M. Cancienne and against Fay Ann Ziegler Cancienne.
Because considerable time has elapsed since the trial on the merits we deem it to be to the best interest of the minor child Melissa Cancienne to remand the question of custody, child support and visitation rights to the trial court. Until such time as the trial court disposes of these issues, custody, subject to visitation rights, shall remain with Mrs. Cancienne and child support shall remain at $628 per month. Mrs. Can-cienne is to pay the house note out of this amount.
Each party is to pay his or her own court costs.
REVERSED IN PART; AND REMANDED.