693 So.2d 1270 (1997)
Sheldon Dwight SIBLEY
v.
Virganna Rae Weber SIBLEY.
No. 96 CA 1544.
Court of Appeal of Louisiana, First Circuit.
May 9, 1997.
Donna Wright Lee, Baton Rouge, for Plaintiff-Appellee.
Alan S. Fishbein and Vincent A. Saffiotti, Baton Rouge, for Defendant-Appellant.
Before SHORTESS, FOGG and TYSON,[1] JJ.
SHORTESS, Judge.
Virganna Rae Weber Sibley (Weber) and her husband, Sheldon Dwight Sibley (Sibley), physically separated on July 4, 1994, after he struck her and she filed criminal charges against him. Sibley filed suit for a divorce under article 102 of the Louisiana Civil Code, which provides for a divorce after a 180-day *1271 separation. Weber answered and reconvened. She alleged she was free from fault and Sibley was guilty of gross physical mistreatment. She sought an article 102 divorce and permanent alimony. Sibley then amended his petition to seek a divorce under Civil Code article 103(2), which provides for immediate divorce upon proof of adultery.
After a trial on the article 103(2) divorce only, the court found in written reasons that Sibley had proven Weber's adultery. The court then rendered a judgment of divorce in Sibley's favor. Weber appeals.

BURDEN OF PROOF
Even in this era of declining mores, adultery is usually not committed in the presence of witnesses. Thus in most cases where adultery is alleged, as in this case, only circumstantial evidence is offered to prove the allegations. Adultery may be proven solely by circumstantial evidence, but in those cases there is a heightened burden of proof similar to proof of guilt in criminal proceedings.[2] The facts and surrounding circumstances must lead fairly and necessarily to the conclusion that adultery has been committed as alleged in the petition. In other words, the circumstantial proof in these cases must be so convincing that it establishes the guilt of the party accused to the exclusion of any other reasonable hypothesis.[3]
This burden of proof is not satisfied merely by evidence that a man and woman were alone together or that the accused had the opportunity to commit adultery.[4] The accused spouse's innocence of immoral acts is presumed.[5] Among the factors to be considered in determining whether this presumption has been overcome are the propensity of the parties to commit adultery,[6] the amount of time the parties spent together,[7] whether there was an obvious amorous relationship between the parties,[8] whether other persons were present when alleged illicit rendezvous occurred,[9] and whether the association between the parties is open or surreptitious.[10]
We must now review the facts of this case to determine whether, as Weber contends, the trial court erred in finding Sibley met this heavy burden of proof.

FACTS
Weber and Sibley had been married only thirteen months when they separated on July 4, 1994. After the separation Weber lived in a duplex with her fifteen-year-old daughter. Richard D. Rhodus and his wife separated in March 1994. Rhodus got a construction job in Baton Rouge, but he had no home in Louisiana. He testified he slept in various places, including his parents' home, his friends' homes, and his truck. It is undisputed *1272 that on the night before this trial and on at least two other occasions he spent the night at Weber's duplex, and on one of those nights no one else was present.
Rhodus and Weber both testified they had known each other approximately thirty-one years. They categorically denied they had ever been romantically involved or had sexual intercourse, although he stated he may have kissed her "a long time ago." Weber stated she allowed Rhodus to spend the night at her duplex because she was afraid of Sibley. She gave the following explanation of her fear.
Sibley had a history of violence during a prior marriage and during his marriage to Weber. Sibley acknowledged his former wife alleged in her separation petition that he had an uncontrollable temper and that he had slapped, struck, and beaten her. He admitted he was convicted of aggravated assault in 1972 but stated he no longer has a violent temper.
However, Sibley pleaded no contest to criminal charges brought against him for slapping Weber's face during an argument on the day they separated. She testified he also shoved her into a fireplace later that day, causing bruises and knots on her arms, although he contended the bruises were a result of plaintiff's lupus. He denied ever striking Weber so as to leave a bruise or mark, although he admitted he threw a bag of coleslaw mix across the kitchen counter at her because he was angry she bought the wrong ingredients for a salad. Weber testified that during their marriage Sibley threatened her with a shotgun because she was reading and would not go to bed. Sibley admitted firing a gun into the woods behind their home but denied threatening Weber with it.
Weber testified after she and Sibley separated, several things occurred that made her fearful. She testified Sibley told her that it would be easy and inexpensive to have someone "taken care of" and make it look like an accident and that she would "always be his." She received an envelope in the mail containing three items that frightened her: (1) an unsigned card with a black feather attached to it and a black heart drawn on it inscribed, "Two animals that deserve each other, together again," (2) a picture of a Native American woman with blood dripping down her mouth and throat and a black heart with an arrow in it, and (3) a passage from the Old Testament with phrases about adultery highlighted. Someone tampered with the locks on her front door and the lights at the back of her home. She had reported the frightening mail to postal authorities and had called the police fifteen to twenty times to report crime around her home. Sibley denied he had threatened Weber, sent her the mail, or tampered with her residence.
Weber testified she was scared to stay alone in her duplex. Consequently, she invited various people to spend the night at her residence. She named several people who had stayed there, including her brother, her twenty-five-year-old daughter, that daughter's boyfriend, her fifteen-year-old daughter's boyfriend, and Rhodus's son. She testified Rhodus had spent the night with her:
Q. Did Mr. Rhodus stay at your house last night?
A. Yes he did.
Q. Has he stayed at your house on other occasions?
A. Yes he has.
....
Q. Have you ever had sexual intercourse with Mr. Rhodus?
A. No I have not.
Q. Ha[s] Mr. Rhodus ever spent the evening at your home when your child was not present?
....
A. Yes.
....
Q. When was that?
....
A. I don't remember exactly when it was.
Sibley hired several detectives to spy on his wife. One of the detectives, Jessie Jones, testified Rhodus spent the nights of September 11 and 12 and November 10 and 11, 1994, at Weber's duplex. Jones stated he would drive by the duplex looking for Rhodus's vehicle, and if he found it he would spend the *1273 night conducting surveillance. He testified on the morning of September 12, he saw Weber's older daughter leave. Weber left about 7:00 a.m. with the younger daughter, apparently to take her to school. Weber returned home and shortly thereafter Rhodus and Weber came to the front door. Jones stated Rhodus kissed Weber on the lips and then walked to his truck, which was parked across the street about twenty feet from the front door, and left.
Jones testified that on the morning of September 13, he saw Weber take the younger daughter to school and return to the duplex, and Rhodus again came out the front door and left. On both days Weber wore what was described by Jones as either a dress, a gown, or a duster.
Marjorie M. Chisolm, an investigator who worked for Jones, was conducting surveillance in a separate vehicle at the same time as Jones. Her description of the September morning events was the same as Jones's except she did not see Rhodus kiss Weber. She stated she saw no hugging, kissing, or touching between them. She described Weber's clothing as a floral lounging dress that Weber also wore to take her daughter to school. Chisolm stated she and Jones watched Weber's duplex for the next two months but did not see Rhodus's vehicle in the area again until November 10.
Rhodus and Weber denied Rhodus spent the night at Weber's on September 11 and 12. Rhodus testified he was working in Weatherford, Texas, on those dates. Weber testified she called him at his hotel there. Rhodus stated the president of his employer had given him a letter stating he was in Texas on those days, but the trial court refused to admit the letter into evidence.
Jones testified they drove by Weber's duplex almost every day between September 13 and November 10. They spotted Rhodus's truck about 8:00 p.m. on November 10. Rhodus did not leave until 6:36 a.m. the next morning. Weber left to take her daughter to school about thirty minutes later. Jones drove by at 3:30 a.m. on November 12 and saw Rhodus's truck parked in Weber's driveway. He watched the apartment until 6:36 a.m., when Rhodus walked out the front door and left. Jones terminated surveillance at that time without determining whether anyone else was in the duplex. Jones did not watch Weber's duplex after November 14, 1994. Jones testified he made surveillance videos, but those videos were not introduced into evidence at trial.
Sibley hired David C. Mastrianni, another private detective, to serve a subpoena on Rhodus and to conduct surveillance. Mastrianni initially testified he was certain Rhodus was living with Weber. He stated every time he went to Weber's duplex, Rhodus was there, and on July 9, 1995, he saw Rhodus sitting on Weber's couch when he went there to serve a subpoena on Rhodus.
Mastrianni later admitted he had been there only four times and had never conducted an overnight surveillance. His testimony was extremely equivocal. He told the court he was distracted, shaky, and nervous because his mind was on another case. He stated he met Rhodus outside the duplex sometime in March 1995. He went to Weber's on July 8, 1995, to serve Rhodus but could not verify he was there. He returned on July 9 to serve the subpoena. Weber came to the door and told him Rhodus was not there. Mastrianni could see a man sitting on the couch, but he could not verify the man was Rhodus because he never saw his face. On July 10, he returned to Weber's and threw a subpoena on the ground at her door, although he was not sure Rhodus was there. He also threw a subpoena at the door of Weber's friend, Peggy Lewis, because Rhodus's truck was parked at Lewis's.
Dean A. Lewis, another private detective hired by Sibley, researched a pager rented by Rhodus and Rhodus's employment status. He testified Rhodus used Weber's post office box number and her telephone number when he rented the pager. He stated Rhodus worked for M.J. Construction from September 7, 1994, to February 5, 1995. Rhodus testified he did not recall using Weber's mailing address and telephone number to rent the pager.

THE TRIAL COURT'S FINDINGS
The trial court found there was no direct evidence Rhodus and Weber had sexual intercourse.
*1274 It then correctly stated the burden of proof when the only evidence is circumstantial, i.e., that the court must exclude all other reasonable hypotheses. The court found Sibley was a violent and abusive person who had abused Weber but stated the abuse "does not justify adultery." The court concluded it had excluded all reasonable hypotheses other than Weber and Sibley had "a sexual and amorous relationship." It based this conclusion on a factual finding Rhodus had spent "many nights" at Weber's, including more than one occasion when her daughter was not home.
Giving the trial court's factual findings due deference, those findings do not support a conclusion that every reasonable hypothesis has been excluded. The mere fact Weber and Rhodus spent the night under the same roof does not necessarily mean they committed adultery. We have examined the evidence in light of the factors found in the jurisprudence and note the following. The association between Weber and Sibley was open, not surreptitious; he came and went through the front door and parked his truck either directly across the street or in her driveway. The only evidence of an amorous relationship was Jones's testimony Rhodus kissed Weber on the lips as he left on September 12. There was no evidence of sexual touching or hugging, and Rhodus and Weber testified their relationship was purely platonic. Sibley presented no evidence either Rhodus or Weber had a propensity to commit adultery. They rarely spent the night alone; Weber's daughter was usually there. Finally, despite Sibley hiring four detectives to spy on his wife, they documented Rhodus spending only four nights at Weber's duplex during a one-year period.
Weber presented the hypothesis that her old friend Rhodus spent the night at her duplex because she was afraid of Sibley, whom the trial court found was a violent and abusive man. This is a reasonable hypothesis. The trial court was clearly wrong in finding Sibley had overcome the presumption of Weber's innocence of adultery. Therefore, we must reverse the trial court judgment in Sibley's favor. Because the trial court never ruled on Weber and Sibley's petitions for divorce under Civil Code article 102, we must remand this case to the trial court for further proceedings. Sibley is cast for all costs.
REVERSED AND REMANDED.
NOTES
[1] Judge Ralph E. Tyson of the Nineteenth Judicial District Court is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Tampira v. Tampira, 539 So.2d 981, 982 (La. App. 4th Cir.), writ denied, 541 So.2d 876 (La. 1989); Stewart v. Stewart, 422 So.2d 1370, 1371-72 (La.App. 1st Cir.1982); Breaux v. Breaux, 323 So.2d 486, 488 (La.App. 1st Cir.1975).
[3] Hayes v. Hayes, 225 La. 374, 377-78, 73 So.2d 179, 180 (La.1954); Stewart, 422 So.2d at 1371-72; Breaux, 323 So.2d at 488.
[4] Lachney v. Lachney, 579 So.2d 1097, 1098 (La. App. 2d Cir.1991); Weaver v. Weaver, 438 So.2d 1149, 1151 (La.App. 1st Cir.1983); Seal v. Seal, 421 So.2d 421, 422 (La.App. 1st Cir.1982).
[5] Emfinger v. Emfinger, 550 So.2d 754, 759 (La. App. 2d Cir.1989); Seal, 421 So.2d at 422; Fister v. Fister, 131 So.2d 103, 104 (La.App. 3d Cir. 1961).
[6] Emfinger, 550 So.2d at 759.
[7] See Hermes v. Hermes, 287 So.2d 789, 790 (La.1973) (wife and paramour saw each other almost daily); Tampira, 539 So.2d at 983 (paramour slept at wife's home three nights a week for several months); Breaux, 323 So.2d at 487 (wife shared trailer with paramour for two and one-half months).
[8] See Hermes v. Hermes, 287 So.2d at 790 (wife and paramour had a close and intimate relationship and testified they were in love); Everett v. Everett, 345 So.2d 586, 590 (La.App. 4th Cir.), writ denied, 349 So.2d 329 (La. 1977) (paramour admitted to an amorous affair); Menge v. Menge, 491 So.2d 700, 701-702 (La.App. 5th Cir. 1986) (wife admitted she got undressed, got into bed with paramour, and engaged in sexual activities, including oral sex); Morris v. Morris, 152 So.2d 291, 295 (La.App. 1st Cir. 1963) (paramour admitted to "friendly hugging and kissing" that "occasionally became passionate").
[9] Emfinger, 550 So.2d at 759; Weaver, 438 So.2d at 1151.
[10] Kendrick v. Kendrick, 232 La. 1104, 1109, 96 So.2d 12, 14 (1957).